Belinda DUPUY, et al., Plaintiffs,

v.

Jess McDONALD, Director, Illinois Department of Children & Family Services, in his official capacity, Defendant.

No. 97 C 4199.

United States District Court,
N.D. Illinois,
Eastern Division.

March 30, 2001.

Jeffrey Bensley Gilbert, Johnson, Jones, Snelling & Gilbert, Robert E. Lehrer, Diane L. Redleaf, Lehrer & Redleaf, Amy L. Zimmerman, Chicago Lawyers' Committee for Civil Rights Under Law, Inc., Chicago, IL, for Plaintiffs.

Nancy K. Hall–Walker, Illinois Attorney General's Office, Barbara Lynn Greenspan, Attorney General's Office, Danielle Jenkins Steimal, Office of the Attorney General, James C. Stevens, Jr., Office of the Illinois Attorney General, Thomas Lee Ciecko, Ciecko & Murphy, P.C., Kathryn Jill Olfe, Cook County Public Guardian's Office, Patrick Thomas Murphy, Peter J. Schmiedel, Charles Perez Golbert, Office of the Cook County Public Guardian, Daniel Thomas Hartnett, Martin, Brown, Sullivan & Bowman, William Gibbs Sullivan, Martin, Brown & Sullivan, Ltd., Chicago, IL, for Defendant.

Donald G. Watson, Chicago, IL, Pro se.

Gladys F. Kennedy, Chicago, IL, Pro se.

## MEMORANDUM OPINION AND ORDER

PALLMEYER, District Judge.

Plaintiffs represent a class of persons who have been named as perpetrators of child abuse or neglect in "indicated reports" placed in the State Central Register of the Illinois Department of Children and Family Services ("DCFS"). Defendant Jess McDonald is the Director of DCFS. Seeking injunctive relief, Plaintiffs challenge the constitutionality of certain DCFS policies and procedures for investigating allegations of child abuse and neglect and for issuing "indicated" reports. Specifically, Plaintiffs challenge three "core" policies: the indicated report decision-making policies, including the burden of proof standard; the notice and hearing policies; and the disclosure and use of indicated reports. Plaintiffs also challenge five "special" policies which arguably only affect subgroups of the Plaintiff class: the imposition of protective or safety plans; foster care placement holds; "not responsible" findings; the extended registry of indicated reports; and indicated findings made without a determination that an individual acted intentionally, recklessly or negligently. For the reasons set forth below, the court finds that certain of these current DCFS policies and procedures do in fact deprive class members of constitutionally-protected rights. The court will not, however, dictate a remedy or draft revisions to the regulatory structure. Instead, it directs the parties themselves to develop a workable solution, and present it to the court, within 60 days. Plaintiffs' motion for preliminary injunction is therefore granted in part and denied in part.

### FINDINGS OF FACT

**I. Overview Of The Department Of Children And Family Services**

1. The Department of Children and Family Services ("DCFS" or the "Department") is statutorily required to protect the health, safety and best interests of the child in all situations, including both public and private, in which the child is vulnerable to child abuse or neglect. (325 ILCS 5/2.) DCFS is also responsible for offering protective services in order to prevent further harm to the child and to other children in the same environment or family. (*Id.*) As such, DCFS is the state agency charged by statute with the duty of investigating allegations of child abuse and neglect. (*Id.*)

2. Under the Juvenile Court Act, 705 ILCS 405/1 *et seq.*, DCFS may be granted temporary custody of children requiring protective services. Under the same Act, DCFS becomes permanently responsible for children who are adjudicated by a juvenile court to be abused and neglected and become wards of the court. (705 ILCS 405/2–10.)

3. DCFS' Licensing Unit is responsible for issuing child care licenses pursuant to the Illinois Child Care Act, 225 ILCS 10/4, for monitoring licensees, and for enforcing the licensing standards pursuant to the Child Care Act and pursuant to DCFS rules and procedures.

4. DCFS is organized into various operational divisions. The Division of Child Protection ("DCP") is responsible for operating a hotline to accept calls regarding allegations of child abuse and neglect (the "DCFS Hotline"). In addition to accepting reports of abuse or neglect, DCP is also responsible for investigating the allegations. (325 ILCS 5/7, 5/7.3.) Edward Cotton is currently the DCP's chief administrator. The DCFS Hotline accepts over 350,000 calls per year, of which 65,000 are investigated. (Tr. 1475, 1492.) Approximately 23,000 (or 1/3) of the investigations are "indicated," meaning that the investigator has determined that credible evidence of child abuse or neglect exists. (Tr. 1492–93.) The rest of the investigations result in "unfounded" determinations, meaning that the investigator has not found credible evidence of abuse or neglect. (Tr. 1493.)

5. The State Central Register ("SCR") is a subdivision of the DCP that maintains a computerized listing of information regarding allegations of abuse or neglect, including the determination that an allegation of abuse or neglect has been indicated against a particular named perpetrator. Linda Everette–Williams is the head of the SCR; she reports to Edward Cotton. The Child Abuse and Neglect Tracking System ("CANTS") is a computerized tracking system maintained by the SCR.

6. The DCFS Operations Unit provides follow-up services to children and families and includes both foster care licensing workers and primary case managers for children who are in the guardianship of DCFS and placed in foster homes, group homes and child care institutions.

7. The Administrative Hearings Unit ("AHU") receives, processes, and hears appeals from DCFS actions, including any appeal seeking expungement of an indicated report from the SCR. The AHU also hears licensing denial and revocation appeals, and service appeals which involve, for example, decisions to remove a child from a particular placement.

8. DCFS has promulgated rules and written procedures which specify the manner in which the Department implements its statutory mandates. DCFS has also established standardized form notices concerning, among other things, the conduct of abuse and neglect investigations and determinations, licensing investigations and determinations, and background checks.

## II. The Abuse and Neglect Investigative Process

### A. In General

1. Assessments of child abuse or neglect can result in criminal prosecutions, civil actions, juvenile court proceedings, adoption actions, domestic relations suits, and administrative determinations.

2. In 1975, Illinois enacted the Abused and Neglected Child Reporting Act ("ANCRA"), 325 ILCS 5/1 *et seq.* Sometime between 1989 and 1992, DCFS adopted the current centralized state-wide system for investigating, registering and tracking al-

legations and findings of abuse and neglect.

## B. Training of Investigators

1. To become a DCP investigator, an individual must have a bachelor's degree in a social services field and two years of social service or investigative experience. It is unclear from the record what degrees qualify as social service degrees. DCP investigators are not required to have any experience or background in child development.

2. Prior to assuming responsibility for conducting investigations, DCP investigators are required to attend two weeks of specialized training in addition to the five weeks of core training for all DCFS case managers. The five week core training covers, among other subjects, case planning, interviewing, clinical decision making, child development, family dynamics, juvenile court processes, and Child Endangerment Risk Assessment Protocol ("CERAP") forms, rules, and procedures. The specialized two-week training, solely for investigators, includes eight modules: (A) principles of investigation; (B) indicators of child abuse and neglect; (C) interviewing children and families; (D) investigation preparation; (E) investigation, including decision-making and documentation; (F) risk assessment; (G) initial services; and (H) placement services. The total time devoted to the specialized training is 49.45 hours. This specialized training does not include instruction on how to weigh evidence; Edward Cotton testified that the principal goal of the training is to teach investigators what evidence should be gathered. After the specialized training, investigators must pass a certification exam.

3. The DCP requires investigators to have twenty additional hours of training every two years, but investigators are not disciplined if they do not meet this requirement.

4. Once they complete this additional two weeks of specialized training, investigators continue their training by accompanying more experienced workers on investigations. Six months later, DCFS assigns the investigators their own cases. Each investigator is expected to be individually responsible for conducting twelve investigations per month. These investigators gather evidence, conduct investigations, and then weigh the evidence in order to decide whether to "indicate" or "unfound" a report.

5. In addition to their seven total weeks of training, investigators are provided with a comprehensive CPS Handbook, hundreds of pages in length, which details the investigative process. The CPS Handbook explains what the investigator is required to do during the investigation, what evidence he or she is expected to consider, and what facts are to be considered in determining the outcome of the investigation.

## C. The Initiation of an Investigation and CANTS 1

1. Any person can make a child abuse or neglect report by calling the toll-free DCFS Hotline. Certain persons whose employment brings them into frequent contact with children are "mandated reporters" and are thus required to make a Hotline report if they have a reasonable belief that a child may be abused or neglected. (ILL. ADMIN. CODE tit. 89, § 300.30.)

2. Upon accepting a call, a DCFS Hotline operator must determine whether the following criteria are met: (1) the alleged victim is under the age of 18; (2) the person allegedly responsible is an "eligible perpetrator," such as an immediate family

member, a person responsible for providing care, or a person residing in the home where care is being provided; (3) there are specific incidents of alleged abuse or neglect which cause harm or substantial risk of harm to the child; and (4) the alleged victim has been harmed or is in substantial risk of harm. These are the minimum criteria for further investigation.

3. DCFS maintains an allegation system which assigns a discrete number code to specific allegations of abuse or neglect. All abuse allegations are coded with a one or two digit number under thirty and all neglect allegations are coded with a two digit number greater than fifty. Each allegation of abuse or neglect focuses on harm or the risk of harm to the child.

4. If the Hotline call is deemed to be made in good faith and to meet the minimum criteria for further investigation, the Hotline operator completes a CANTS 1 form and assigns the case an SCR number and letter.[1] On the CANTS 1 form, the operator records the names of the alleged victim, the alleged perpetrator and other adults in the alleged victim's home or facility (and the relationship between all such persons), and the name of the person making the report. The alleged victim, the alleged perpetrator and the other adults in the home/facility are considered "subjects" of the investigation. On the second page of the CANTS 1 form, the operator writes a narrative summary of the allegations of abuse and neglect made by the caller.

5. The investigator then checks for prior reports against the "subjects" in the Child Abuse and Neglect Tracking System. If a "subject" has been investigated

for a prior incident resulting in an indicated report, the report will be noted on the CANTS 1 form with an "I" next to an allegation number. This is true even for prior indicated reports where the perpetrator was determined to be "unknown" and all suspected perpetrators were notified that they were "not responsible" for abuse and neglect. Where an individual was determined to have been the perpetrator of abuse or neglect in a prior investigation, the prior report is identified on the CANTS 1 form with an "X."

6. The SCR transmits the completed CANTS 1 form to a local DCP office where an investigator is assigned. The assigned investigator is responsible for conducting the investigation and for making a final determination as to whether to "indicate" or "unfound" the report.

**D. Investigative Contacts**

1. Investigators must attempt to see the alleged victim within 24 hours of the Hotline call. (ILL. ADMIN. CODE tit. 89, § 300.100.) The investigator who makes this initial contact with the alleged victim is not necessarily the investigator assigned to complete the investigation.

2. After this initial interview with the alleged victim, the investigator is required to complete the CERAP which is designed to identify and quantify the risk to the alleged victim.

3. The investigator then continues an initial investigation to determine if there is reasonable cause to believe that child abuse or neglect exists. This initial investigation is to be completed within 14 days after assignment. A preliminary determi-

1. The first time an allegation of abuse or neglect is made against a particular alleged perpetrator, the investigation is assigned a six digit number and the letter "A." If subsequent allegations of child abuse and neglect are made against the same suspected perpetrator, the investigation is given the same number with the next corresponding letter of the alphabet. When an abuse or neglect report is made against a facility, the sequence is listed according to the number of reports involving the facility, not the specific perpetrator.

nation that there is reasonable cause triggers a formal investigation of the allegations. Without reasonable cause, a case may be "informally unfounded." About 15% of cases are informally unfounded.

4. DCFS rules provide that, in a formal investigation, an investigator must have in-person contact with the alleged victim, the alleged perpetrator, and the child's caretaker. (ILL. ADMIN. CODE tit. 89, § 300.110(c).) Under DCFS Procedures, required contacts are expanded according to a system of priority of the allegations.

5. The investigator is required to contact the alleged perpetrator within seven days after assignment. (*Id.*) Cotton testified that during this initial contact, the alleged perpetrator is given a CANTS 8 form and a pamphlet that describes what to expect during the course of the investigation. (Tr. 1516–17.)

6. The CANTS 8 form (also known as, "Notification of a Report of Suspected Child Abuse and/or Neglect") is the only notice required to be given, during the investigation, to any person who is a "subject" of the investigation. All adult "subjects" are to receive a CANTS 8, and an alleged perpetrator must be handed the CANTS 8 in person. Therefore, identical CANTS 8 forms are given to any person who has custody of the child as well as to any person who is or may become a suspected perpetrator. When a report of abuse or neglect arises out of an incident at a child care facility, however, the CANTS 8 may be given to the facility director rather than to any identified employee.

(a) The CANTS 8 form merely advises the person who receives the form that an incident involving the child(ren) named was reported to have occurred at an identified site. It also advises the recipient that DCFS is required to conduct an investigation, which must be "indicated" or "un-founded" within 60 days of the report unless good cause is shown. (Jt. Ex. 21, at 22.)

(b) The CANTS 8 does not specify the allegations, name the suspected perpetrator of the abuse or neglect, or explain the investigative process. The CANTS 8 also fails to inform the recipient of any rights afforded to persons being investigated as perpetrators. It does state, however, that if the report is found "indicated," it will remain in the SCR for a minimum of five years. (*Id.*)

7. DCFS directives do not require that every allegedly abused or neglected child be seen by a doctor or qualified medical examiner before the report may be indicated.

**E. Final Determinations—Concluding the Investigation**

1. "When the investigative worker has completed all required investigative contacts and has secured appropriate physical evidence . . . the investigative worker shall make a finding of Indicated or Unfounded. This determination shall be based upon whether the information gathered during the investigation and from the direct observations made by the investigative worker constitutes credible evidence of child abuse or neglect." (ILL. ADMIN. CODE tit. 89, § 300.110(i)). In order to indicate a report against a perpetrator under the allegation system, DCP must "secur[e] credible evidence that the child sustained the harm or injury as the result of the action or inaction, of the alleged perpetrator." In determining whether the suspected perpetrator undertook "direct action" to harm a child, it is unclear whether DCP must determine that the suspected perpetrator acted intentionally, recklessly, or negligently. Therefore, except for allegation # 74 (inadequate supervision), DCP is au-

thorized to indicate perpetrators even without evidence that the perpetrator acted intentionally, recklessly, or negligently.

2. At all relevant times, DCFS has employed the "credible evidence" standard as the burden of proof for determining that reports be indicated and placed in the SCR. Plaintiffs argue that this, in practice, amounts to an "any credible evidence" or "some credible evidence" standard. Prior to March 1, 1996, administrative law judges ("ALJs") were to apply this "credible evidence" standard in administrative hearing recommendations. The Director of DCFS would then apply the same standard when reviewing the ALJ's recommended decision.

3. Effective March 1, 1996, DCFS promulgated regulations which directed ALJs to apply a "preponderance of the evidence" standard in administrative hearing recommendations. The new regulations direct the Director of DCFS to apply this same "preponderance of the evidence" standard when reviewing the ALJ's recommended decision. (ILL. ADMIN. CODE tit. 89, §§ 336.120(h), 336.150(a).)

4. DCFS regulations define an "indicated report" as "any report of child abuse or neglect made to the Department for which it is determined, after an investigation, that credible evidence of the alleged abuse or neglect exists." (Jt. Ex. 1, ILL. ADMIN. CODE tit. 89, § 300.20.) Plaintiffs argue that DCFS directives define an indicated report as "any report of child abuse or neglect made to the Department for which it is determined, after an investigation, that *some* credible evidence of abuse or neglect exists." (emphasis added.) The court was unable to locate such language anywhere in the record. The regulations define an "unfounded" report as a report in which "it is determined, after an investigation, that *no* credible evidence of abuse or neglect exists," (emphasis added) and

an "undetermined" report as any report in which it was "not possible to complete an investigation within 60 days on the basis of information provided to the Department." (*Id.*) In some cases, allegations are indicated, but no determination is made as to who is the perpetrator of the abuse or neglect. These cases are referred to as being "indicated to an unknown perpetrator." In some cases, however, this "not responsible" finding on an indicated report is registered in the SCR under the original suspect's name. Therefore, such information can appear on an individual's background check even though the individual was found "not responsible." This finding is also troublesome when a report against a facility is listed under the owner's name as opposed to the facility name. (Pls.' FOF pages 5557.)

5. After completing the investigation, the DCP worker recommends a final determination. As part of this process, the investigator completes a Family Assessment Factor Worksheet ("FAFW") to document his or her determination of whether a report should be "indicated" or "unfounded." The FAFW requires the investigator to determine the extent of long-term risk factors to the health and safety of the child, focusing on the relationship between the alleged perpetrators and the children, environmental factors, and the history of abuse or neglect. (Tr. 1523.) Ultimately, on the FAFW, the investigator explains his or her rationale for "indicating" or "unfounding" a particular report.

6. An investigator's recommended decision regarding the outcome of an investigation is reviewed by the investigator's supervisor who has the actual authority to "indicate" or "unfound" the investigation. Supervisors sign the FAFW to signify their approval of the investigator's recommended finding.

7. Once his or her recommended finding has been approved, the investigator completes a CANTS 2 Final Finding Report form and forwards it to the SCR, where it is registered as indicated or unfounded. (Jt. Ex. 1, ILL. ADMIN. CODE tit. 89, § 300.110(j)(2)). A CANTS 2 form is a computerized summary of the information gathered in an investigation, including a computerized coding of the allegations and a determination of whether the report as to each allegation was indicated or unfounded. The CANTS 2 form also codes a retention schedule for the report, discernible only by persons familiar with such codes.

8. DCFS regulations require that an investigation be completed within 60 days. (ILL. ADMIN. CODE. tit. 89 § 300.110(i)(3)(C)). This time period may be extended for periods of up to 30 days upon a showing of good cause. (*Id.*) Examples of reasons that would constitute good cause are:

(i) State's attorneys or law enforcement officials have requested that the Department delay making a determination due to a pending criminal investigation; (ii) medical or autopsy reports needed to make a determination are still pending after the initial 60 day period; (iii) the report involves an out-of-state investigation and the delay is beyond the Department's control; and (iv) multiple alleged perpetrators or victims are involved necessitating more time in gathering evidence and conducting interviews.

(ILL. ADMIN. CODE. tit. 89 § 300.110(i)(3)(D).) The regulations do not, however, indicate to whom a showing of good cause must be made.

## F. Notices Regarding Indicated Reports

1. After the DCP has forwarded the CANTS 2 form to the SCR, the SCR issues a standardized notice to alleged perpetrators informing them of the results of the investigation (the "SCR Notice"). (Jt. Ex. 20, at 101–105.)

2. At the time of the preliminary injunction hearing, the SCR Notice informed the recipient that the Department determined the report to be indicated and that the recipient was "identified as a person responsible for the child abuse or neglect." (Jt. Ex. 20, at 101.) This notice did not, however, inform the recipient of the facts of the alleged incident; indeed, a recipient was not even informed whether he or she was indicated for abuse as opposed to neglect. The form also did not suggest that the finding was a final decision that would remain in the SCR for any specific period of time.

3. The SCR Notice did explain that the recipient could appeal the indicated finding in writing within 60 days, but it did not explain the consequences of missing the 60–day deadline.

4. In addition, the Notice advised the recipient that the information in the report was confidential, but that access to it was governed by state law. The Notice did not advise a child care professional who was the subject of an indicated finding that the report would be sent to his or her employer and that his or her licensing entity, if any, would also be notified of the report.

5. Special notification letters, including CANTS 1 and 2 forms and a redacted copy of the investigative file, are sent to persons whom DCFS has identified as child care professionals who are likely to appeal. The special notification letter suffers from the same defects as the standard indicated report letter. (Jt. Ex. 20, at 116.)

6. When DCFS determines that there is credible evidence of abuse or neglect, but no evidence that the person to whom the letter is sent is responsible for that

abuse or neglect, the person receives an "indicated but not responsible" letter from the SCR. (Jt. Ex. 20, at 104–05.) This letter informs the recipient of the appeals process, but if such an individual does appeal, he or she receives a letter suggesting that an appeal is unnecessary because "you were not found to be responsible for child abuse/neglect." (Jt. Ex. 20, at 112.)

7. Effective June 1, 2000, DCFS codified new regulations governing the information to be included in the SCR Notice. (ILL. ADMIN. CODE tit. 89, § 336 *et seq.*) ("Amended Rule 336"). According to Amended Rule 336, the SCR Notice must provide the following information:

> (a) a specific statement whether the Department has determined the report indicated or unfounded as a result of an investigation; (b) the name of the perpetrator; (c) the allegations determined indicated; (d) the length of time the indicated case shall be retained by the Department; (e) a statement that a Department review of an indicated decision is available; (f) a statement that ... a review ... must be requested in writing within 60 days after notification of the completion of the investigation by the Child Protective Service Unit ...; and (g) the name and address of the individual who must be contacted in order to request a review of the Department's decision.

(ILL. ADMIN. CODE tit. 89, § 336.30.) DCFS has not provided the court with copies of the new notice or with any additional rules or procedures it may have promulgated since the codification of this new regulation.

### G. Retention of Indicated Reports

1. According to Illinois statute, "[i]dentifying information on ... records shall be removed from the register no later than 5 years after the report is indicated[,]" ex-

cept that indicated reports "involving the sexual abuse of a child, the death of a child, or serious physical injury to a child ... may be retained longer than 5 years ... and may not be removed from the register except as provided by the Department in rules." 325 ILCS 5/7.14.

2. Each abuse and neglect allegation is assigned to one of three retention categories based on the nature of the allegations. Category 1 allegations (death of a child and/or sexual penetration) are retained for fifty (50) years. Category 2 allegations (involving serious physical injury, sexual molestation or sexual exploitation of a child) are retained for twenty (20) years. All other allegations fall into Category 3 and are retained for five (5) years. Some allegations listed in Category 2 may be retained for five (5) years depending on the seriousness of the injuries as determined by the investigator. (ILL. ADMIN. CODE tit. 89, § 431.30.) To determine the seriousness of the injury, the investigator is instructed to consider: the extent of the injuries (whether limited to one spot, or multiple injuries); the long-term effects of the injuries (whether there will be permanent scars or disabilities); the medical treatment required (whether hospitalization or surgery is required); and, the pattern of injuries (whether there is an ongoing history). (Jt. Ex. 1, Procedure § 300.110(18)-(19).) The rule provides that if "none of the above factors are present, the allegations are to be retained for five years." (*Id.*) The rule does not, however, state the extent to which any one of the four factors need be present in order to warrant a Category 2 classification.

3. The Abused and Neglected Child Reporting Act provides that after the expiration of the retention period, the indicated report must be expunged, unless another report is received involving the same child, his sibling or offspring, or a child in

the care of the persons responsible for the child's welfare. *See* 325 ILCS 5/7.14. For example, if during the statutory period of retention for an individual's indicated report, there is a subsequent indicated report against the same individual, the original report is retained until the expiration of the retention schedule applicable to the subsequent report. At the end of the latter retention schedule, however, both reports are expunged. (Tr. 1755–58.) Also, if a child is a victim in one indicated report against an adult perpetrator, and that child is later indicated as a perpetrator, the original report is retained for the length of the new report. (Tr. at 1766–67.) In other words, even if the original adult perpetrator is not in anyway involved in the subsequent report, the original report would remain in the SCR, and the individual would not receive notice of the extension.

4. On at least some occasions, DCFS has improperly retained reports beyond the date on which they were to be expunged. (Pls.' Exs. A–D.)

### H. Appeals Process

1. Appeals from indicated reports are now are governed by Amended Rule 336. At the time of the hearing before this court, though, the former Rule 336 had established a three-step administrative appeals process: the initial request for review or "exchange of information" step; an internal review of the indicated report; and an administrative hearing conducted by an ALJ from the administrative hearings unit ("AHU").

2. The initial request for an appeal began the appeals process. All requests for appeals had to be made in writing within 60 calendar days of the postmark on the SCR Notice. DCFS dismissed initial requests for appeals made after the 60–day deadline. (ILL. ADMIN. CODE tit. 89,

§ 336.190(a)(4).) During this stage, the indicated perpetrator was provided with a redacted copy of the investigative file. (Jt. Ex. 2, Procedure 336.80.) Under Amended Rule 336, this first step of the appeals process is the same. The redacted copy must be provided to the appellant within 20 days of his or her request. (ILL. ADMIN. CODE tit. 89, § 336.40) ("Upon receipt of a timely request for an appeal, the Department shall send the appellant within 20 days after the receipt of the request a copy of the investigative file from which confidential information has been deleted . . . .").

3. At the time of the preliminary injunction hearing, the second stage of the appeals process was a child protection internal review conducted by DCFS regional staff. (Jt. Ex. 2, Procedure 336.80(a).) The internal review team was comprised of individuals who had no prior involvement in indicating the report being reviewed. (Jt. Ex. 2, Procedure 336.90(b).) The internal reviewers considered the material in the appellant's investigative file and written statement, and were instructed to reach an internal review decision within 30 days. (Jt. Ex. 2, Procedure 336.90(e)(3).) Internal review decisions, however, offered only a very summary rationale for upholding an indicated report. The appellant then had only 15 days to appeal the internal review decision, a time frame Plaintiffs considered unreasonably short. (Jt. Ex. 2, Procedure 336.110.) According to the record, 46.9% of the indicated findings that were internally reviewed were, upon completion of such review, expunged by DCFS. (Pls.' Ex. UUU, Graph 3.) While this internal review step appears to have been eliminated by the new regulations, the court is not certain of this because DCFS has not provided the court with new procedures or rules implementing the new regulations.

4. The final stage of the administrative appeals process involves a hearing before an ALJ. Under the prior regulations, "the Administrator of the Administrative Hearing Unit shall . . . schedule the hearing at a date within 30 calendar days of the date [of] the appellant's written notice stating that the issue was not resolved to the appellant's satisfaction." (Jt. Ex. 2, Procedure 336.110(d)(1).) The AHU, however, routinely sent appellants a letter informing them that while DCFS had received their hearing request, it could not schedule a hearing promptly due to a backlog of hearing requests. The ALJ was required to issue a written opinion and recommendation to the Director within 30 calendar days after the close of the administrative record. (Jt. Ex. 2, Procedure § 336.130(b)(14).)

5. Under Amended Rule 336, the ALJ must provide the appellant a hearing date within 70 days of the date of receipt of the appellant's request for a hearing. (ILL. ADMIN. CODE tit. 89, § 336.110(a)(1)). At this stage of the appeal, as discussed earlier, the Department, which before March 1, 1996 applied a "credible evidence" standard of review, now applies a "preponderance of evidence" standard. (ILL. ADMIN. CODE tit. 89, § 336.100(e)(2)).

6. At the administrative hearing stage, an appellant may secure the issuance of subpoenas, but because the investigative files are so heavily redacted, an appellant is often unable to identify adverse witnesses. Although an ALJ can order the release of an unredacted copy of the investigative file pursuant to 89 ILL. ADMIN. CODE § 431.60(a), Edward Cotton testified that he knew of no cases in which an ALJ had ordered such a release. (Tr. 1821–22.) Also, children under the age of 14 are not allowed to testify at the hearing unless the ALJ determines that such testimony is essential to the determination of the ap-

peal and there is no likelihood of inflicting emotional harm to the child. (ILL. ADMIN. CODE tit. 89, § 336.110(b)(2)(A)). Therefore, even where a report is indicated principally on the statements of children, those children may not actually testify at the hearing.

7. According to Amended Rule 336, the ALJ shall have authority to "present a written opinion and recommendation to the Director within 15 calendar days after the record of the administrative hearing is completed . . . . This report shall include a recommended decision on whether there is a preponderance of the evidence of abuse or neglect based on information in the administrative record. The opinion shall contain findings of fact, conclusions of law and a recommendation." (ILL. ADMIN. CODE tit. 89, § 336.120.) Furthermore, Amended Rule 336 states that "[t]he Director of the Department shall receive the [ALJ's] recommended decision 90 days after receipt of a timely and sufficient request for an appeal [and] [w]ithin the same 90 day period, the Director shall receive and accept, reject, amend or return to the [AHU] for further proceedings the [ALJ's] recommendation." (ILL. ADMIN. CODE tit. 89, § 336.220(a).)

8. Appellants, both at the time of the preliminary injunction hearing and currently, cannot, during the appeals process, obtain a stay against the inclusion in the SCR of an indicated report against them or the disclosure of the indicated report to employers or licensing representatives. (Cotton Dep. at 123–25.)

9. Under both the former regulations and current regulations, the following persons receive notice of the final administrative decision:

(a) the Illinois Department of Professional Regulation, district, regional and private school superintendents and the State Board of Education when they

have been notified that an appeal has been filed in accordance with [§ 300.140];

(b) administrators of child care facilities and Department licensing staff when the appellant is an employee of a child care facility; and (c) supervisors or administrators notified in accordance with [§ 300.100(i)].

(Jt. Ex. 2, Procedure § 336.150; ILL. ADMIN. CODE tit. 89, § 336.220(d).) Furthermore, the following persons receive notice of the final administrative decision, if the decision amends, expunges or removes any record made under Section 7.11 of [ANCRA]: "(a) parents or personal guardians of the child victim(s) if they are not the same as the appellant; (b) the mandated reporter who originally made the report of child abuse or neglect; [and,] (c) the juvenile court judge and guardian ad litem (when a State ward is involved)." There is no evidence that DCFS informs persons who were contacted during the investigation about the results of an indicated perpetrator's appeal.

10. According to the record, DCFS expunged 46.9% of the indicated reports appealed to the internal review stage of the appeals process. (Pls.' Ex. UUU, Graph 3.) DCFS expunged 63.3% of indicated report appeals following an administrative hearing. (*Id.*) Ultimately, 74.6% of appealed indicated reports are expunged throughout the appeals process. (*Id.*) In fact, of the twenty-four named Plaintiffs who timely appealed indicated reports against them, DCFS expunged 100% of those indicated reports.[2]

11. The duration of the investigative and appeals processes for these twenty-four named Plaintiffs ranged from 0.4 years to more than three and a half years.

(Pls.' Ex. UUU, Graph 2.) The average duration of the investigative process and the appeals process for the seven Plaintiffs who were afforded administrative hearings of their appeals was more than 2.1 years. (*Id.*) The average duration of the investigative and appeals processes for the seventeen Plaintiffs whose indicated reports DCFS voluntarily expunged prior to an administrative hearing was 1.3 years. (*Id.*)

### III. Employment and Licensure Action Based on Indicated Reports

#### A. Unsuitability for Employment or Licenses

1. DCFS issues licenses for the following types of facilities: home day cares, group home day cares, emergency shelters, foster homes, and child care agencies and institutions. *See* 225 ILCS 10/3, 10/2.18, 10/2.20, 10/2.21, 10/2.17; 205 ILCS 505/5. DCFS licenses are subject to renewal on a three or four-year schedule.

2. In addition to licensing a home or facility, a DCFS licensing representative monitors licensees for compliance with licensing standards and also conducts licensing complaint investigations upon receiving allegations that a home or facility has violated licensing standards. (Pls.' Ex. NN, Deposition of Virginia Conlee, DCFS' Associate Deputy Director for Licensing, at 12–14.)

3. Any allegation of abuse or neglect accepted by the Hotline that concerns an incident occurring in a licensed facility is subject to investigation by both the DCP and by a DCFS licensing representative. (*Id.* at 22.) Indeed, a licensing complaint investigation is mandatory in every case in

---

**2.** There are actually twenty-seven named Plaintiffs. No expungement order was issued as to three of the Plaintiffs (G.A., T.A., V.A.), however, because DCFS claims that they did not file timely requests for internal review.

which a DCP investigation is pending and involves a "facility." (*Id.*) Nevertheless, when a Hotline call is made, the SCR does not automatically issue a notice to the Licensing Unit, but rather the individual DCP investigator contacts the appropriate licensing representative. (*Id.* at 21.) Indicated reports may also be used against an individual in license revocation actions.[3] DCFS revoked or refused to renew 21 child care licenses based on indicated reports during the two-year period from January 1, 1996 through December 31, 1997. (Pls.' Ex. NN, Conlee Dep., Ex. 41.)

4. In order to obtain or renew a license, or to work unsupervised with children in a licensed facility, DCFS must first conduct a background check on the license applicant, the licensee or the employee. The background check determines whether the person at issue has an indicated report against him or her (*Id.* at 35), and reveals one of the following: that no reports were registered; that a child abuse or neglect investigation is pending; that an indicated report is "possible;" or that one or more reports of indicated findings exist.

5. Pursuant to Rule 385, which was in effect at the time of the hearing before this court and currently remains in effect, DCFS is required to disclose indicated reports to the licensed employers of any person who has an indicated report against him or her and to licensing representatives. (Jt. Ex. 4, ILL. ADMIN. CODE tit. 89, § 385.50(b)(1).)

6. If an individual is indicated based on any one of fourteen allegations,[4] or has more than one indicated report based on any one of eighteen other allegations,[5] all denominated in Rule 385.50(a), the individual is presumed by DCFS not suitable for work that allows access to children ("presumption cases"). By labeling such individuals as presumptively unsuitable for work, in essence, DCFS requires that the employer or licensing representative take some action with respect to the employee or licensee, including termination.

7. Employers and licensing representatives may request that the Director waive the Presumption of Unsuitability. (ILL. ADMIN. CODE tit. 89, § 385.50(b)(2).) Unless or until the presumption is waived by the Director, the person presumed unsuitable cannot work with children. (Pls.' Ex. NN, Conlee Dep. at 60.) If the employer continues to employ the indicated perpetrator without a waiver, DCFS' Licensing Unit is required to take enforcement action against the employer, including condi-

3. Licensing representatives investigate licensing complaints. If a complaint is substantiated, the licensee will be subject to a corrective plan and informal review. If the Licensing Unit determines that there is no alternative to revocation in order to protect children, a notice of intent to revoke is issued. A notice of intent to revoke is appealable by "public hearing." (Pls.' Ex. NN, Conlee Dep. at 111–116, 156–158, 233–34.)

4. The fourteen allegations are as follows: (1) death; (2) brain damage; (3) subdural hematoma; (4) internal injuries; (5) wounds (e.g., gunshot, knife, puncture); (6) torture; (7) sexually transmitted diseases; (8) sexual penetration; (9) sexual molestation; (10) sexual exploitation; (11) failure to thrive; (12) mal-

nutrition; (13) medical neglect; and (14) a single indicated report of child abuse or neglect that resulted in serious injury to the child, regardless of the allegations involved.

5. The eighteen other allegations are as follows: (1) burns or scalding; (2) poison or noxious substances; (3) bone fractures; (4) cuts, bruises, or welts; (5) human bites; (6) sprains or dislocations; (7) tying or close confinement; (8) substance misuse; (9) mental injury; (10) substantial risk of physical injury; (11) inadequate supervision; (12) abandonment or desertion; (13) medical neglect; (14) lock-out; (15) inadequate food; (16) inadequate shelter; (17) inadequate clothing; and (18) environmental neglect.

tional licensing, a corrective plan or license revocation. (*Id.* at 79–80.)

8. In cases in which a person has been indicated for an allegation that is not enumerated in Rule 385.50(a), DCFS still requires employers and licensing representatives to make a licensing or employment "decision" in light of the indicated report, and to advise the Department of the decision ("non-presumption cases"). (Jt. Ex. 4, Rule 385.50(c).) In non-presumption cases, if the employer wants to retain the employee in a position that permits access to children, he must request a CANTS clearance from the Licensing Unit. (Pls.' Ex. NN, Conlee Dep., Ex. 33.)

9. For both types of cases, Rule 385.50(b)(1) provides that a person with an indicated report "shall not automatically be denied a license or refused license renewal . . . [or] be denied a position which allows access to children in a child care facility licensed by the Department." (Ill.Admin.Code, tit.89, § 385.50(b).) Instead, an employer or a licensing representative must afford the person with an indicated report an opportunity to present evidence as to why he or she should be retained as an employee or licensee. (*Id.*) The types of evidence the rule identifies as evidence the Department or employer may consider in making its decision assume that the indicated finding was accurate and that the individual did commit abuse or neglect. (Ill. Admin. Code tit. 89, § 385.50(b)(1)(A-H).)

10. Indicated perpetrators have no right to seek a waiver or a CANTS clearance from DCFS on their own, nor do they have the right to dispute an employer's or licensing representative's failure to seek waivers or clearances. (Pls. Ex. NN, Con-

lee Dep. at 148–49; Jt. Ex. 4, Ill. Admin. Code tit. 89, § 385.50(c) (an employer's decision is "final, subject to review under the personnel policies of the [employer's] governing body.").)

11. DCFS reviews the employers' and the licensing representatives' requests for waiver, and can deny them. DCFS has not promulgated any directives defining the circumstances under which presumed unsuitability will be waived, and sets forth no time standards within which it must act on a request for waiver. (Pls.'s Ex. NN, Conlee Dep., at 82.) Indeed, sometimes there are significant delays in granting waivers. (Pls.' Ex. A at 4913–4924 (11 months), 4957–4971 (7 months), 5028–5041 (14 months).) DCFS does not issue a notice to the employee or licensee when a request for waiver is denied (*Id.* at 147), and denials are unappealable. (*Id.* at 82.)

12. While the "Notice of Presumption of Unsuitability" informs employers that they must afford employees an opportunity to present their case and retain employment, DCFS does not monitor this process. (Pls.' Ex. NN, Conlee Dep., at 67.) Moreover, while employers are supposed to notify the Licensing Unit when they make decisions, they do not always do so, particularly when the employer terminates the employee. (*Id.* at 73.)

**B. Indicated Report Notices to Employers and Licensing Representatives**

1. Once notified of indicated reports,[6] the Licensing Unit generates notices to send to employers and licensing representatives requesting employment or licensing decisions with respect to the person

---

**6.** The Licensing Unit is notified of pending investigations on a report of abuse or neglect through a CANTS 21 form (Jt. Ex. 21, at 27), and of indicated reports through a CANTS 21a form. (Jt. Ex. 21, at 28.) The Licensing Unit is also notified of indicated reports through its performance of background checks.

against whom the report is indicated.[7] In the most recent version of these notices, DCFS directs employers to complete their responses and inform DCFS of their employment decision within 30 days. (Pls.' Ex. NN, Conlee Dep., Exs. 32, 33, 35.)

2. In July 1997, the Licensing Unit began to send "Notices of Presumed Unsuitability" to employers whose employees had indicated reports against them and to licensing representatives when individuals with indicated reports applied for licenses or operated licensed facilities. The notices inform employers and licensing representatives that the Department has made a presumption that the individual is not suitable for a position which allows access to children, and that the employee must demonstrate to the employer his fitness for employment or his fitness for operating or residing in a licensed facility.

3. Notices in both presumption and non-presumption cases advise employers and licensing representatives of the procedure for securing a waiver of the presumption or a CANTS clearance and the types of evidence that may be considered in deciding whether to make one of those requests. (*Id.*, Exs. 4, 6, 14, 15, 32, 33, 35.) Along with the notices, DCFS sends an abstract that lists the allegations against the employee/licensee and some identifying information. (*Id.*, Ex. 5.) None of these notices informs the employers or the licensing representatives that the employee or licensee has the right to appeal the indicated report against him or her.

4. The employee or licensee does not directly receive one of these notices. (*Id.*, Conlee Dep., at 259–60.)

5. During the time period between July and November 1997, 42% of employers who received notices of presumed unsuitability denied employment or terminated the employment of the person with the indicated report. (Pls.' Ex. UUU, Graph 5.) During that same time period, 27% of employers did not respond at all, and 27% requested waivers.

**IV. Safety and Protective Plans**

1. In conjunction with investigations into child abuse and neglect, DCFS utilizes a variety of plans aimed at protecting children pending the outcome of an investigation and/or after a report has been indicated.

2. Protective plans apply only to licensed facilities, including day care centers, foster homes, child welfare agencies and group homes. Pursuant to DCFS Rules, the alleged perpetrator is required to be restricted from contact with children in the facility during the investigation. (Jt.Ex. 1, Procedure, § 300.160(b).) There is no requirement, however, that DCP investigators wait until deciding to initiate a formal investigation before they initiate protective plans; such plans may be prepared after all child victims are seen by the investigator. (Tr. 2531.) Protective plans are to be documented on CANTS 21B or 21C forms. (Jt. Ex. 21, at 29–30.) In this licensing context, the protective plan prepared by the DCP investigator is

---

7. There are two types of notices (for presumption and non-presumption cases), each of which has two variants (for employers and for licensing representatives). Furthermore, there have been three versions of each form, the first in effect prior to mid–1998, the second in effect until February 1, 1999, and the third in effect after February 1, 1999. The most recent version of these forms reminds an employer that it "MUST provide the employee/volunteer an opportunity to present evidence which demonstrates fitness for employment.... Under no circumstances shall the person automatically be denied a position which allows access to children in a licensed facility." (Conlee Dep., Ex. 6.)

enforced and/or modified by the licensing representative.

3. CERAP safety plans are similar to protective plans, but can also be applied to other family cases. (Tr. 2515–16.) There is no specific authority for safety plans in DCFS Rules or Procedures. Safety plans are to be prepared on CFS 1441 (CERAP) forms. (Jt. Ex. 21, at 89.)

4. The sole DCFS directive addressing protective plans is Rule 300.160 which applies to licensed child care facilities only. This Rule sets forth no guidelines or procedures for determining which conditions may be appropriate or excessive depending on the circumstances of the alleged abuse or neglect. Protective and safety plans have no prescribed durational limit and are not appealable by any means.

5. Protective and safety plans are voluntary, but refusal to agree to such a plan may result in removal of a child from a home or a facility if the investigator determines that refusal would render the child unsafe.

6. If a protective plan is violated, DCFS may revoke the license of the home or facility, lower the capacity of the home or facility, alter licensing conditions, or remove a child.

7. Examples of protective and safety plan action involving the named Plaintiffs included: restricted hours of operation; a requirement that household members, including minors, be moved out of their own home; a requirement that additional staff be hired; a requirement that a certain employee or owner of a facility not work with children; and removal of foster children from a home, combined with a prohibition on new placements in that home.

## V. Examples of the Investigative and Appeals Processes

The court's hearing on Plaintiffs' motion for preliminary injunction spanned 18 days, from May 17, 1999 until September 3, 1999. This hearing generated a 2,952 page transcript. From this massive record, the court has selected a handful of cases as illustrative of problems that DCFS policies and procedures have created or exacerbated.

### A. Plaintiff A.H.

1. A.H. is a twenty-six year old woman who came to the United States from Guatemala in 1993. She is currently a legal permanent resident of the United States. A.H. is married and has three children.

2. In August 1996, S.N. hired A.H. to care for her child, P.O., in her home. At the time of A.H.'s hire, S.N. was separated from her husband and had primary custody of her son, P.O., born June 22, 1996. When S.N.'s work required her to be out of town, A.H. would spend the night at S.N.'s home caring for P.O.

3. P.O. suffers from a seizure disorder which began to manifest itself when P.O. was four months old. According to S.N., when P.O. experienced a seizure, he would cry abnormally, his body would stiffen, his eyes would roll back, and he was unresponsive for several minutes. (Pl.'s Ex. X at 72.) Prior to September 19, 1997, A.H. had never witnessed P.O. suffering a seizure.

4. On September 19, 1997, A.H. spent the night at S.N.'s home while S.N. was out of town for business. At 1:30 a.m., A.H. awakened to a loud noise followed by P.O. screaming. She ran to P.O.'s room where she found him trying to stand up, but his face was rigid and he appeared unable to focus. A.H. noticed that P.O.'s left leg was twisted to one side, and that he was attempting to stand on his right leg.

5. Around the same time, S.N. returned home from her trip. As A.H. brought P.O. out of his room, S.N. arrived at the top of the stairs. During the rest of the night, P.O. slept only intermittently, awakening frequently and crying. Between 8:00 and 8:30 a.m., both S.N. and A.H. took P.O. to Children's Memorial Hospital where two physicians examined him. (*Id.* at 20, 23–26.) During that time, P.O.'s father, J.O., also came to the hospital.

6. At S.N.'s insistence, the physician X-rayed P.O.'s leg. The X-ray showed a fracture in P.O.'s left femur. (*Id.* at 29.) The physician was then joined by another physician and they asked A.H. what led to the injury. The physicians, in what A.H. testified was a hostile manner, continued to ask A.H. questions. P.O. remained hospitalized for four days.

7. During P.O.'s hospitalization, A.H. visited him. On P.O.'s second day at the hospital, a social worker interviewed A.H. during one of her visits. Specifically, the social worker asked A.H. how the fracture occurred, whether A.H. had any prior contacts with DCFS, and about her relationship with S.N.'s family.

8. On September 22, 1997, medical personnel made a call to the DCFS Hotline reporting the incident that occurred on September 19, 1997. DCFS assigned Martin Acevedo to investigate the case. (*Id.* at 1–6.)

9. A.H. first met with Acevedo on September 24, 1997 at S.N.'s home while S.N. and P.O. were present. A.H. and S.N. were interviewed individually and together. During her interview with Acevedo, A.H. repeated the version of events she provided to the medical personnel at the hospital. A.H. indicated that she thought the injury may have been caused by the child catching his foot between the crib rails during his seizure. (*Id.* at 25–26.)

10. During this initial interview, Acevedo completed and provided A.H. with a copy of a "Notification of a Report of Suspected Child Abuse and/or Neglect" form (CANTS 8). This document did not indicate that A.H. was considered a suspect, but it did inform her that an investigation had been opened, and that if credible evidence of child abuse and/or neglect were found, the report would stay on file with the Central Register for a minimum of five years. The notice also informed A.H. that all information in the Central Register is confidential. Finally, the notice informed A.H. that she would be notified in writing of the outcome of the investigation. (*Id.* at 7.)

11. A.H. testified that during this initial interview, Acevedo informed her that she would be barred from caring for P.O. if DCFS were to make a finding that she was the perpetrator. In his notes of this meeting, Acevedo wrote that he informed A.H. "that she cannot b[aby]s[it] [P.O.] pending investigation." (*Id.* at 26.) A.H. testified that during the interview, Acevedo gave her the impression that he was not paying attention to her or to P.O.'s efforts to interact with her.

12. At the same time, Acevedo interviewed S.N. who told Acevedo that A.H. provides "exceptional" care for her son and that she had no concerns or complaints about A.H. (*Id.* at 23–24.) Acevedo also observed on that day that P.O. appeared "chunky, healthy, and clean." (*Id.* at 27.) From the record, it appears that Acevedo made no contacts with the subjects of the report or with collateral contacts during the month of October and the first half of November.

13. Acevedo next met with A.H. on November 12, 1997 when he arrived at S.N.'s house unannounced. (*Id.* at 35.) A.H. testified that Acevedo was "livid" when he

found A.H. at S.N.'s house, asking her "didn't I tell you [that] you couldn't work here anymore?" According to A.H., Acevedo then told S.N. that A.H. could not work for S.N. pending the investigation, claiming that he knew that A.H. had abused P.O. A.H. testified that S.N. objected, but that Acevedo insisted that he would charge S.N. with neglect if she continued to employ A.H. At this time, A.H. and S.N. agreed that A.H. would discontinue caring for P.O. until the matters with DCFS were resolved. Three weeks later, Acevedo and his supervisor, Madeline O'Leary, informed A.H. that she could return to work for S.N., but that if P.O. were ever hurt again while in A.H.'s care, DCFS would remove P.O. from S.N.'s care.

14. During the investigation, Acevedo interviewed several other people. On September 26, 1997, and on November 18, 1997, he spoke with one of P.O.'s treating physicians, Dr. Flaherty, from Children's Memorial Hospital. According to Acevedo's notes of the first conversation, Dr. Flaherty opined that because the injury could have been caused only by some type of forceful twisting or turning, A.H.'s explanation that P.O.'s leg got caught in the crib spindles was not plausible. (*Id.* at 29.)

15. Acevedo also spoke with P.O.'s other treating physician from Children's Memorial Hospital, Dr. Grayhack. According to Acevedo's notes from their November 20, 1997 phone conversation, Dr. Grayhack told Acevedo that "it is extremely unlikely that the fracture occurred inside the crib." (*Id.* at 40.) In an affidavit dated January 29, 1998, however, Dr. Grayhack opined that based on the medical history of the child, the nature of the injury and his interactions with P.O.'s parents and grandparents, "there exists a possibility that the

cause of [P.O.'s] fracture was accidental." (*Id.* at 71.)

16. On November 14, 1997, Acevedo spoke by telephone with Dr. Weiss, P.O.'s pediatrician. Having knowledge of P.O.'s history of nocturnal seizures, Dr. Weiss concluded that the injury could have occurred in his crib if he had caught his leg in the vertical bars during a seizure. Indeed, in a letter to DCFS dated March 6, 1998, Dr. Weiss wrote "[i]t is my strong opinion that [P.O.] was not the subject of child abuse from the baby sitter." (*Id.* at 72.)

17. Acevedo spoke with Dr. N., a retired surgeon and S.N.'s father, on November 17, 1997. Dr. N. also confirmed P.O.'s seizure disorder and concluded that the injury could have resulted from P.O. catching his leg in the vertical bars of his crib during a seizure. Dr. N. also told Acevedo that A.H. is a "positive person" for P.O. (*Id.* at 38.)

18. Acevedo also spoke with P.O.'s father, J.O., on September 26, 1997. In his conversation with Acevedo, J.O. referred to A.H. as an "exceptional nanny" and "a nice person." Another person for whom A.H. had worked as a babysitter also told Acevedo on September 28, 1997 that A.H. provided excellent care for his child, and that she is "outstanding." (*Id.* at 31.)

19. Acevedo's investigative notes contain a record of a phone conversation he had with A.H. on November 24, 1997. According to his notes, Acevedo told A.H. that the case would be indicated, meaning that the report would remain in the State Central Register for a minimum of five years.[8] Acevedo also wrote that he informed A.H. of her right to appeal the decision, and informed her that she would

---

8. As noted in Paragraph 24 of this Section, *see infra,* Acevedo understated by 15 years the

length of time A.H.'s indicated report would remain in the SCR.

receive a letter with the results of his investigation. (*Id.* at 41.)

20. A.H. testified that she never received such a letter, and the investigative file contains no record of the letter. Instead, on December 9, 1997, DCFS sent S.N. a notice entitled Investigation of Suspected Child Abuse or Neglect, advising her that DCFS had completed its investigation and that the report was "indicated." The notice did not identify the type of abuse indicated. This notice further informed S.N. that the report would remain in a confidential file in the State Central Register, although it did not state the length of time the report would remain there. Finally, the notice informed S.N. that DCFS has an appeal process by which inaccurate reports may be amended or destroyed. (*Id.* at 45.)

21. On January 6, 1998, A.H. sent a letter informing DCFS of her intent to appeal the indicated finding, and requesting a copy of the investigative file on her case. DCFS did not respond to this request. (*Id.* at 46.) A.H. saw a copy of her file for the first time more than a year later, on January 28, 1999, during her own deposition taken by DCFS in connection with this litigation.

22. According to the Family Assessment Factor Worksheet, filled out by the investigator after the investigation was complete, Acevedo indicated A.H. for P.O.'s bone fracture because the two treating physicians opined that it was unlikely that P.O. had been injured in his crib. (*Id.* at 17, 19.)

23. On February 22, 1999, pursuant to the DCFS regulations in place at the time of the preliminary injunction hearing, A.H. requested an internal review, attaching all the exculpatory evidence described above. (*Id.* at 50–73.) On March 22, 1999, DCFS notified A.H. that after conducting an internal review, it had determined that credible evidence existed to support the indicated finding, and that it therefore denied her request for expungement. (*Id.* at 75–78.) The internal reviewer's rationale for upholding the indicated report was attached to this notice. The reviewer explained that the indicated report was supported by a "preponderance of the evidence" because Dr. Flaherty, in consultation with all the other physicians, including P.O.'s pediatrician, had concluded that the fracture was not consistent with the explanation given by A.H. (*Id.* at 78.) The evidence reflects, however, that P.O.'s pediatrician, in fact, believed that P.O. likely injured his leg in his crib during a seizure episode.

24. A.H. filed a timely appeal from the decision denying expungement of the indicated finding against her. (*Id.* at 79.) A hearing was initially scheduled on May 12, 1999, but did not actually begin until July 7, 1999. On August 11, 1999, before the hearing resumed, however, DCFS voluntarily unfounded the report, and directed that A.H.'s name be removed from the SCR. (*Id.* at 74.) Because A.H. had been indicated for a serious physical injury to P.O. (broken femur), had the record not been expunged, it would have remained in the SCR for twenty years.

25. Before expungement of her record, A.H. sought employment with two agencies that employ child care workers. Because both agencies asked about her prior involvement with DCFS, she was not permitted to apply for the positions. In both January and March 1998, A.H. called DCFS to inquire about getting a license to operate a day care center. On both occasions she was told she could not be licensed with an outstanding indicated report.

**B. Plaintiff R.F.**

1. Plaintiff R.F. became a foster parent after DCFS attempted to place a relative

of hers, an infant named Arquel, with her in June 1993. Because R.F. did not qualify as a sufficiently close relative of Arquel to care for her without a license, DCFS advised her that she was required to become licensed as a non-relative foster parent. In September 1993, R.F. began the process of applying for a foster care license. R.F. obtained her license in December 1994.

2. Although R.F. had not yet secured her foster care license, DCFS appeared before a juvenile court judge to obtain permission to place another child, Latrice, born with cocaine in her system, with R.F. DCFS placed Latrice with R.F. on February 4, 1994.

3. Within the following year, R.F. also assumed responsibility for four of Latrice's siblings: Veronica, Georgia, Andrea and Lachita. As a result, R.F. had six foster children in her home. R.F. also had a minor son, although from the record it is unclear with whom he lived.[9]

4. The siblings' biological parents had been substance abusers. Veronica, Andrea, and Georgia were sexually and physically abused in two previous foster home placements. Veronica and Andrea also had a documented history of fighting physically with one another. As a treating therapist reported in January 1996, these three girls exhibited severe behavioral disorders upon arriving at R.F.'s home, engaging in physical altercations with each other and in sexual play with dolls and with each other. (Pl.'s Ex. U at 82–83.) On her own initiative, R.F. obtained in-home therapy for all six children and special individual treatment for Veronica, Andrea, and Georgia at the University of Illinois.

5. On December 21, 1995, Veronica and Andrea got into a fight in the dining room and began beating each other with an extension cord. At the time of the altercation, R.F. had been downstairs doing laundry and R.F.'s mother was in the living room with the three younger girls. (*Id.* at 15.) R.F. testified that she didn't hear the girls fighting, but once she came from the laundry room, she observed each of them holding one end of the extension cord. By this time, Andrea had sustained a swollen lip and both girls sustained bruises and loop-shaped welts. A subsequent medical exam revealed that the injuries were superficial and covered two percent of their bodies. (*Id.* at 38–39.) Andrea sustained eighteen marks and bruises; Veronica had seven marks.

6. The next morning, December 22, 1995, R.F. reported the injuries to Andrea Scott Collins, the girls' DCFS case manager. By the time she reached Collins, however, a Hotline report had been made by personnel at Veronica and Andrea's school. DCFS assigned Capucine Tigner to investigate the allegations of abuse. (*Id.* at 16.)

7. Tigner arrived at the school that same morning. She met with Veronica and Andrea (*Id.* at 17–18), and examined them, marking body charts to document the location of the injuries. (*Id.* at 72–77.) Tigner testified that Collins was not present at the school during her initial investigation because she was at an office party. Nevertheless, Tigner's investigative notes purport to document an in-person contact with Collins at the school at 11:05 a.m. According to these notes, Collins told Tigner that she believed R.F. would not hurt the children, and that she is an "excellent" foster parent. Further, according to these notes, Collins told Tigner that R.F. herself

---

**9.** R.F. testified that her son resides with her sister. DCFS investigative files, however, in- dicate that he may have lived with R.F. during at least some of the time in question.

had called her to report the incident. (*Id.* at 16.)

8. Tigner then interviewed Veronica and Andrea, both of whom related that they had inflicted the marks on each other. Specifically, each of the girls stated that the other hit her with a stick and an extension cord. Both girls stated that R.F. was downstairs at the time of their fight. (*Id.* at 17–18.) Tigner next interviewed the person who made the Hotline call (the "reporter"), who told Tigner that the girls had changed their story. According to the reporter, the girls initially said that Georgia had hit them with an extension cord, but later said that they had hit each other. (*Id.* at 19.) According to Tigner's notes, Veronica stated that no adults were upstairs at the time of the fight. Tigner also interviewed Georgia at the school. Georgia stated that her sisters hit each other with the extension cord, and that she herself was not in the house when the fight occurred. (*Id.* at 20.)

9. Later that same day, Tigner also interviewed R.F. at the school. Her notes from the interview state that she provided R.F. with a CANTS 8 Form and explained the form to R.F. What Tigner specifically told R.F. about the investigation is not recorded. R.F. told Tigner that she was doing laundry when the children began fighting. According to Tigner's notes, R.F. reported that Andrea and Veronica "have a lot of problems" and they "beat each other up." Further, according to the notes, R.F. stated that her mother was responsible for the girls' injuries. (*Id.* at 22.) At the hearing, however, R.F. testified that she never identified her mother as the perpetrator.

10. Before interviewing R.F., though, Tigner phoned her supervisor, Karen Swigert, who, without seeing any of the children or knowing any of their placement histories, instructed Tigner to have Collins remove the children from R.F.'s home pending further investigation. Swigert further instructed Tigner to have the two girls medically examined and to proceed to R.F.'s home to interview the three other children. (*Id.* at 21.) Tigner then accompanied R.F. to her house where she observed Latrice, Lachita, and Arquel, who had no marks on their bodies. She noted that all three children were dressed neatly and had good hygiene. (*Id.* at 23–25.) Tigner further observed R.F.'s home to be "spacious, with adequate food, lights, gas, heat, adequate furniture," though also "a little messy." (*Id.* at 27.)

11. Tigner also interviewed R.F.'s mother who corroborated that R.F. was doing the laundry when the girls began fighting. R.F.'s mother also told Tigner that she was the first on the scene, and that she saw the girls using an extension cord to beat each other. (*Id.* at 26.) Tigner did no further investigation of R.F.'s mother's account, despite Tigner's awareness that R.F.'s mother was present at the time of the injuries and that, according to Tigner's notes, R.F. had implicated her mother in the beating.

12. In a second phone conversation with her supervisor, after interviewing R.F., Tigner reported that Collins believed the younger children were not at risk of harm and, therefore, should not be removed. Nevertheless, Tigner's notes indicate that DCFS Administrator John Robinson instructed Swigert to have Tigner remove the children. (*Id.* at 28.) Tigner testified that she did not recall discussing the option that only Veronica and Andrea be removed. Tigner then called Collins' supervisor, Barbara Barnett, who agreed that all six children should be removed from R.F.'s home. (*Id.* at 30.) At 1:45 p.m., less than three hours after first seeing the children, Tigner instructed Collins

to remove all six children from the home.[10] (*Id.* at 29.)

13. Tigner told R.F. that she was going to indicate the report against R.F., and that she was removing the children because of imminent risk of harm. (*Id.* at 32.) In completing the Child Endangerment Risk Assessment Protocol (CERAP) form, Tigner checked a box which states "Caretaker has not, will not, or is unable to provide sufficient supervision to protect child from potentially moderate to severe harm." (*Id.* at 56.) Tigner testified that she could not state whether she found R.F. generally unwilling to provide supervision or merely that she had not done so during one incident.

14. Tigner further testified that the basis for the removal decision was that the children were wards of the state (for whom DCFS has a heightened duty of protection) with marks on their bodies. On December 22, 1995, Tigner did not provide any written notice of removal to R.F. Indeed, despite her seven years as an investigator, Tigner testified before this court that she had no familiarity with the "Notice of Decision" form which is required to be given to foster parents when placement changes are made. Tigner further testified that she considered significant the fact that R.F. had not sought medical treatment for the injuries, and that she failed to call DCFS about the incident. The court notes that the medical exam concluded that the injuries were superficial, and that medical treaters prescribed Tylenol. (*Id.* at 38–39.) The court further notes that Tigner's own notes reflect that Collins told Tigner that R.F. had indeed called to report the incident prior to going to the girls' school.

15. On January 3, 1996, Tigner spoke with R.F. by phone. According to Tigner's notes, she discussed the issue of neglect with R.F. and explained the appeals process by which R.F. could appeal an indicated finding once "she receives the official letter from Springfield." (*Id.* at 32.)

16. On January 4, 1996 Tigner spoke by phone with Jim Jarzembowski, who had worked as the therapist for Veronica, Andrea and Georgia shortly after their placement with R.F. in 1994. (*Id.* at 34.) He told Tigner that the children had a history of being destructive to themselves and their environment. Although he apparently believed this incident happened as a result of a breakdown in supervision, he did not feel there was a risk that this sort of violence would recur. According to Tigner's notes, this therapist was primarily concerned about the children's losing the progress they had made while at R.F.'s home, and losing a sense of stability. That same day, this therapist wrote a letter to Tigner further expressing his concern about the removal of the children from R.F.'s home and the impact of the removal on their psychological development. (*Id.* at 82–83.) From the record, it does not appear that Tigner responded to this letter.

17. On January 12, 1996, Tigner completed a Family Assessment Factor Worksheet, recommending that the case against R.F. be found indicated for neglect, lack of supervision, and substantial risk of physical harm, but unfounded for physical abuse. (*Id.* at 63–70.) On the worksheet, Tigner reported that although she did not find R.F. had inflicted the injuries, she

---

**10.** Because Collins was the DCFS case worker for the five siblings only, she had no authority to remove Arquel. Nevertheless, Katrina Bates, Arquel's worker, removed her later that day. Bates' supervisor, Sharon Luckett, and Tigner spoke about the incident by phone on January 3, 1996. According to Tigner's notes, Luckett told Tigner that she and Bates were unaware that R.F. had other foster children in the home.

likewise did not believe the children had inflicted the injuries on each other. (*Id.* at 70.) She further reported that although "it was revealed that Veronica and Andrea have never hurt one another to this extent before in the past, the incident did occur." (*Id.* at 67.) In her concluding rationale, Tigner wrote, "Evidence show[s] that it is likely that all six children received neglect in the home of foster parent." (*Id.* at 70.) On the copy provided to R.F., it is unclear on what date Tigner's supervisor signed and approved the indicated recommendation. (*Id.*)

18. R.F. did not receive a notice that the report was indicated. Because the removal occurred without prior written notice to her, R.F. had the right to an emergency review of the decision to remove the children. DCFS conducted an emergency review on February 15, 1996. (*Id.* at 106.) On March 1, 1996, during a mediation hearing with DCFS, R.F. learned that the report had been indicated. On March 4, 1996 she formally requested an appeal of the finding. (*Id.* at 105.)

19. Also on March 1, 1996, DCFS's Acting Administrator for Administrative Case Review sent R.F. a letter explaining that upon conducting an emergency review, DCFS had determined that it had not documented the existence of reasonable cause to believe that imminent risk of harm to the children would result if the children were returned to her during the appeals process. The Administrator determined that the children "should be returned to you pending the final outcome of your service appeal." (*Id.* at 106.)

20. The five siblings were returned to R.F.'s care on March 11, 1996. Arquel was not returned to R.F.'s home, although R.F. continues to have a relationship with her.

21. Although the siblings continued to experience behavioral and emotional prob-

lems, they made progress in R.F.'s home and continued in therapy.

22. In June 1996, DCFS transferred responsibility for monitoring the siblings' care to Lutheran Social Services of Illinois ("LSSI"). R.F. testified that LSSI was unresponsive to the children's needs for support services and that she and LSSI had a poor relationship. R.F. believes the girls suffered as a result of witnessing contentious interactions between R.F. and the girls' LSSI worker.

23. In August 1997, LSSI caseworker Shirley Ford made a Hotline call alleging an injury to Veronica. The call reported that Veronica sustained a laceration on her leg after tripping and falling while walking home from school. It appears from the record that this allegation was unfounded shortly after being reported. (*Id.* at 8671.)

24. On November 21, 1997, Shirley Ford of LSSI issued R.F. a fourteen-day notice of intent to remove the five siblings from R.F.'s home effective December 5, 1997. (*Id.* at 8743.) One alleged ground for removal was that on August 25, 1997, LSSI was informed by DCFS of three indicated allegations of child abuse from the December 1995 incident. The same notice also stated that in August 1997, R.F. had called LSSI to report that she had not received the monthly payment for caring for the children, and that as a result she would be unable to prevent her electricity and gas service from being discontinued. The notice therefore alleged that R.F. did not have sufficient financial resources to provide the basic necessities for the children as required by law. A third allegation related to a foster parents' obligation to notify the worker of any situation affecting the care of the child. The notice stated that when the worker went to R.F.'s home to investigate Veronica's leg laceration, Veronica showed her an earlier injury

to her arm that had not been reported. It does not appear that any action was ultimately taken upon this fourteen-day notice as the girls remained in R.F.'s care.

25. On December 8, 1997, R.F. sent a letter to DCFS requesting a reply to her appeal of the indicated report based on the now two-year-old 1995 incident, and stating that she is "still requesting to appeal the indicated report." (*Id.* at 8853.)

26. On January 30, 1998, LSSI issued R.F. another fourteen-day notice of intent to remove the children, stating that the decision to remove the children "is effective immediately." The stated basis for the decision was Ford's January 22 observation of Andrea's "busted lip," a report that R.F.'s child and nephew force the girls to fight each other, and a report that B., R.F.'s sixteen year old niece, is allowed to beat the children, and in fact was the perpetrator of the beating suffered by Veronica and Andrea in 1995. The notice further alleged that R.F. punished the children by pulling their hair, had made derogatory remarks about the children's family, discouraged their visits with another sibling, and frequently exposed her "private parts" to the children. The notice further alleged that unauthorized caregivers had transported the children to and from school and babysat for the children. Finally, the notice alleged that R.F. improperly shared background information with unapproved persons in an effort to secure "business discounts, clothing, etc." (*Id.* at 8749, 8746.) All five girls were removed from R.F.'s home that day.

27. R.F. denied all the allegations, and testified that Andrea sustained a "busted lip" on January 22, 1998 when she had gotten into a fight at school.

28. On February 5, 1998 DCFS conducted an emergency review hearing concerning the January removal of the children without notice. At the hearing, Ford stated that the children's guardian ad litem had made the decision to remove the children and that DCFS' Regional Counsel told her the Andrea's "busted lip" was evidence enough to support the removal. (*Id.* at 114.) The reviewer determined that the children were not at imminent risk of harm at the time of their removal. The reviewer recommended the children be returned to R.F.'s care pending completion of the appeal process. (*Id.* at 113–15.) On February 12, 1998, a supervisor from LSSI sent a letter to DCFS outlining its lingering concerns about the girls' placement with R.F., repeating the allegations made in the January 30, 1998 notice of intent to remove. This letter also stated that the girls' present caregiver noticed a "brownish discharge" from Georgia's vagina, which "is presently being investigated." (*Id.* at 8771–72, 8750–51.)

29. In an undated letter sent to R.F.'s attorney, DCFS' Deputy Director of Administrative Case Review affirmed the reviewer's decision and ordered the girls returned to R.F. (*Id.* at 112.) On March 4, 1998, DCFS issued a recommendation for further investigation of the allegations set forth in the January 30, 1998 notice of intent to remove. This recommendation did not alter the decision to have the children returned home.

30. The children, however, were not returned to R.F.'s care. On March 5, 1998, R.F. filed an emergency petition for rule to show cause with DCFS's AHU. (*Id.* at 118.)

31. On March 6, 1998, Ford made another Hotline call, alleging that, while they had been in the care of R.F., Georgia and Veronica had been sexually abused by R.F.'s son and her nephew, also minors. The CANTS 1 notes of the call allege that the eleven year old boy "simulated intercourse" with Georgia and inserted tissue

into her vagina, the removal of which would require surgery. The notes also allege that the ten year old boy sexually penetrated Veronica. The note "very little info" appears in the narrative account. (*Id.* at 8671–72.) R.F. received a CANTS 8 form dated March 7, 1998 regarding a report of suspected abuse of Georgia, Veronica, and another child (illegible copy). On April 26, 1998, DCFS prepared two other CANTS 8 forms, one listing R.F.'s nephew as a victim of suspected abuse, and the other listing three of the girls, R.F.'s son and R.F.'s nephew as alleged victims.

32. On March 7, 1998, B.M., the girls' new foster parent, entered into a Protective Plan with DCFS pursuant to which Veronica and Georgia were to have no contact with R.F. (*Id.* at 8642.) DCFS assigned Sandra Brand to investigate the sexual abuse allegations.

33. On March 10, 1998, Ford filed an "unusual incident report" regarding the sexual abuse allegations. In this report, Ford noted that Veronica and Georgia related several incidents of fondling and penetration by the two boys. The report also stated that on March 6, 1998 Georgia was taken to a medical doctor who determined that a foreign object was lodged in her vaginal canal. (*Id.* at 8663.)

34. On March 25, 1998, Veronica, Georgia, and Andrea were taken to Cook County Hospital for a Victim Sensitive Interview ("VSI"). The interviewer found their interviews "not consistent and credible." (*Id.* at 8679.)

35. On March 20, 1998, Andrea's therapist prepared a progress report. She wrote, "Since moving from [R.F.'s] home, Andrea's behavior in therapy has deteriorated dramatically.... Andrea reported the new foster mother had 'whipped' a younger sister ...[which was] dismissed by Ms. Ford [of LSSI] as a 'spanking' which in her view did not constitute corporal punishment.... At this point there are many new allegations against Ms. [R.]F. which have to make me suspicious regarding their origins." The letter also described R.F. as a "strong advocate" for the girls. The therapist noted that R.F. "had long ago noticed that Georgia had a vaginal discharge and masturbated frequently and aggressively," and that R.F. had brought this to the attention of Georgia's doctor as early as the summer of 1997. (*Id.* at 8816–18.)

36. On April 7, 1998, R.F. and her attorney appeared at an Emergency Review hearing regarding the January 30, 1998 removal of the children. No other parties appeared. Because the children had not been returned per DCFS's prior order, the reviewer recommended "review by the APT [Agency Performance Team] as to the failure of LSSI to comply with Emergency Review recommendations." (*Id.* at 125.)

37. On April 26, 1998, Brand, the DCFS-assigned investigator, and a youth officer interviewed R.F., her son, and her nephew. According to Brand's interview notes, R.F. told Brand that the girls had been acting out sexually for as long as they had been placed with her. R.F. further stated that she did not leave the kids alone, and that only her mother babysat the children. According to the notes, Brand and the officer "got the impression" that R.F. was "sincere and truthful." (*Id.* at 8693–94.) Both R.F.'s son and nephew denied ever being left alone with the girls or ever engaging in sexual activity with them. Brand noted that the boys appeared truthful, honest and sincere. (*Id.* at 8697–98.) After the interviews, the officer indicated that he was going to recommend the case be unfounded because the girls' versions of events were inconsistent.

38. On April 27, 1998, Brand spoke with LSSI worker Shirley Ford, who expressed her concern that the girls would be returned to R.F. if the report of abuse were determined to be unfounded. (*Id.* at 8700.) After speaking to the LSSI staff, Brand called the youth officer involved in the investigation and informed him that LSSI was not pleased with her recommendation and "may have convinced supervisor Helene Schaefer that C[hild] P[rotection] I[investigator] should re-interview kids even though they have been VSI'd."

39. On April 28, 1998 Brand spoke with R.F. and explained to her that she recommended the case be unfounded as to R.F., but that the abuse be indicated as to an unknown perpetrator. (*Id.* at 8702.)

40. On May 5, 1998, the program manager at LSSI called Brand's supervisor, Helene Schaefer, stating that LSSI's executive director and attorney had told her that R.F. had won her service appeal (whereby, for example, a foster parent may challenge the removal of a child that was in his or her care), and that LSSI would have to return the children to R.F. that next day. In response, Schaefer told LSSI that the current investigation was still pending and that she would be reviewing both the A sequence (12/22/95 incident) and the current investigation before a final decision regarding the placement of the children would be made. (*Id.* at 8704.) LSSI did not return the children.

41. On the same day, Schaefer met with Brand to review the status of the current C sequence investigation. Brand was directed to call the girls' treating medical providers to inquire about any "medical neglect issues" regarding "tissue in vagina." A note was also made regarding the possibility of interviewing Georgia again. It appears that subsequent to this meeting, Brand was removed from the investigation, and Schaefer herself took over.

(*Id.* at 8705.) The notes of this meeting further indicate that the expected completion date of the investigation was to be the following day, May 6, 1998, unless an extension was requested.

42. On May 6, 1998, Schaefer spoke with Robert Harris, the children's guardian ad litem. (*Id.* at 8706.) During this conversation, Schaefer told him that the children might have to be returned to R.F.'s care, but that the pending investigation "is possibly going to be indicated after completion, but not sure for what at this point." Harris indicated his willingness, if need be, to file a motion to prevent the children's return to R.F. Schaefer advised him to call LSSI to gather documentation. Schaefer also advised Harris that she would be seeking an extension on the investigation. There is no indication in the file that R.F. ever received notification that the investigation was being extended.

43. Also on May 6, 1998, Schaefer spoke with the Chief ALJ from the Administrative Hearing Unit of DCFS who advised her that R.F.'s service appeal on the January 1998 removal of the children was still pending and further that she "had nothing in her computer to advise [that] R.F. has appealed SCR A [12/95 indicated report]." (*Id.* at 8707.) Shortly thereafter, Schaefer phoned LSSI, advising them to provide "clinical documentation," presumably of medical neglect, to Harris. Schaefer further advised LSSI personnel that "if the doctors at Wyler's felt there was medical neglect [with regard to the alleged insertion of tissue into Georgia's vaginal canal], they would have called the hotline." (*Id.* at 8708.)

44. In response to LSSI's inquiries, on May 12, 1998, Schaefer told LSSI that no decision had been made regarding the pending investigation, but that all the girls, except Georgia, needed specialized sex

abuse exams at Wyler's or LaRabida. (*Id.* at 8715.)

45. On May 22, 1998, R.F. and her attorney attended a service appeal hearing also attended by Schaefer, LSSI case manager Ford and supervisor Kalish, and the children's GAL. Schaefer recommended that the girls receive specialized sex abuse examinations. (*Id.* at 8718.) At the hearing, the emergency reviewer granted Harris' reconsideration of the former order to return the girls to R.F.'s care based on the "pending DCP investigation" of sexual abuse. (*Id.* at 8819.)

46. On May 27, 1998, Andrea's therapist, Ruth Nudelman, called Schaefer to express her concern about the manner in which the girls were removed from R.F.'s home and the discontinuation of the girls' treatment with their therapists at the University of Illinois. (*Id.* at 8721.) After the phone conversation, Nudelman wrote Schaefer a letter documenting her concerns. According to Nudelman, LSSI accused R.F. of coaching the girls' behavioral problems, including the sexual acting out. She stated further that the biggest obstacle to providing treatment to Andrea was the ongoing conflict between LSSI and R.F. In Nudelman's opinion, "LSSI's abrupt removal of the girls from the home of [R.F.] was clearly traumatic, and raises questions in my mind regarding the current allegations." (*Id.* at 8833–84.)

47. On May 29, 1998, R.F.'s attorney sent Schaefer medical records of the girls dated February 24, 1994 and September 21, 1992. These records reflect admissions to Grant Hospital for evaluations for sexual abuse, physical abuse and neglect (*id.* at 8855–87), and demonstrate long-standing

concerns regarding the children's behavior, well prior to their being in R.F.'s home.

48. On June 12, 1998 R.F. joined the current lawsuit as a plaintiff. As of that time, no internal review decision on R.F.'s appeal from the December 1995 finding had been issued.

49. No further entries in Schaefer's notes concerning this matter appear until July 30, 1998. On that date, Schaefer spoke with a doctor at the University of Chicago Hospital regarding Georgia's surgery to remove the tissue from her vagina. (*Id.* at 8722.) According to her notes, the doctor informed Schaefer that there were "no issues of medical neglect or they would have been reported." (*Id.*)

50. That same day, July 30, 1998, Schaefer spoke with a therapist who had worked with the girls when he was previously employed at the University of Illinois. He recommended that DCFS' Clinical Services Division review the case. According to Schaefer's notes, he also related to her that Andrea, Georgia and Veronica "were probably exposed to sexual matters in natural parents' home and Veronica made a disclosure of being sexually abused by an uncle[.]" (*Id.* at 8723.)

51. On an unspecified date, either Brand or Schaefer[11] completed the Family Assessment Factor Worksheet for the C sequence investigation, recommending that the allegations of lack of supervision, sexual abuse and risk of sexual abuse against R.F. be unfounded. It further recommended that the report be indicated for risk of sexual abuse and sexual abuse to Georgia and Veronica by an unknown perpetrator. This is the same finding that

---

11. This form is signed by Brand, but a comparison of handwriting throughout the form leads the court to believe it was actually completed by Brand's supervisor, Schaefer. (Pl.'s Ex. U at 8731.) It is also accompanied by

Worker Activity Summary completed in Schaefer's handwriting and dated July 30, 1998. Brand also signed the summary, and although it is illegible, it appears that she dated it August 1, 1998. (*Id.* at 8724–25.)

Brand indicated she had intended to make back in April, during a time when DCFS had ordered the children returned to R.F. pending her service appeal.

52. On July 30, 1998, Schaefer notified June Dorn, Foster Parent Licensing Coordinator for Cook South, that the C allegation was indicated to an unknown perpetrator. (*Id.* at 8641.)

53. On August 4, 1998, Schaefer sent Ford a copy of the indicated SCR report. (*Id.* at 8644.) Then, on August 18, 1998, DCFS sent LSSI a letter indicating that the Department had determined the report to be indicated. The letter did not state that it had found R.F., her son and her nephew "not responsible" for the abuse. (*Id.* at 144.)

54. Also on August 18, 1998, DCFS issued letters to R.F., her son and her nephew, stating that the report had been indicated, although none of them was named a person responsible for the abuse. (*Id.* at 145–47.) The letters further informed them that they could appeal if they wanted the report amended or destroyed. On October 14, 1998 R.F.'s attorney sent a letter to DCFS on her behalf, noting her puzzlement about the reports, and appealing the decision. (*Id.* at 148.) After not receiving any kind of response, on January 26, 1999, R.F.'s attorney renewed his request for an appeal on R.F.'s behalf.

55. On September 11, 1998, DCFS issued two internal review decisions upholding the indicated findings of substantial risk of physical injury, inadequate supervision and physical injury based on the December 1995 allegations. The substantial risk of physical injury and inadequate supervision decisions listed "credible evidence that incident occurred" as one criterion for indicating the case. As part of the rationale for upholding the indicated findings, the reviewer listed a "pattern or chronicity of similar incidents" and a "his-

tory of indicated neglect finding." (*Id.* at 130–32.)

56. R.F. requested a hearing on the A sequence review, which was scheduled for December 21, 1998, three years after the incident. (*Id.* at 8522.) On December 2, 1998, ALJ Fahler consolidated R.F.'s service appeal regarding the removal of the children with her expungement appeal of the December 1995 indicated findings, and set a hearing for January 6, 1999. (*Id.* at 8520–21.) Apparently by mistake, the ALJ entered the hearing date as January 16, 1999, a Saturday. (*Id.* at 8521.) Subsequently, the consolidated hearing was set for April 6, 7, 13, and 14, 1999. (*Id.* at 8593.)

57. A year prior, on February 2, 1998, R.F. had applied for a renewal of her foster care license. R.F. did not hear anything about the status of her renewal application until January 26, 1999 when DCFS's Licensing Unit sent her a letter stating that she had an indicated report from September 1995 (the incident referred to actually occurred in December 1995). The letter goes on to incorrectly state that because her "request for an expongement [sic] was denied" the indicated allegations stand. R.F. had not, at that time, received an expungement hearing. The letter further stated that the Licensing Unit had received a copy of the investigation on the March 6, 1998 report which "was Indicated to an Unknown Perpetrator, however, during the investigation information was disclosed regarding the incident from 9/3/95 [sic]. We have written documentation as to who and who inflicted the cuts, bruises and welts on these children." Based on this information, the Licensing Unit then directed R.F. to contact them within ten days to schedule an informal review hearing. (*Id.* at 136–37.) On February 3, 1999, R.F.'s attorney responded, clarifying that the indicated reports at

issue were still on appeal. (*Id.* at 138.) On February 10, 1999, DCFS's Licensing Unit requested a meeting with R.F. to "develop a corrective action plan." (*Id.* at 140–41.)

58. On February 19, 1999, R.F. and her attorney met with DCFS licensing representatives. At the meeting, R.F. and DCFS licensing representative entered into an agreement under which the Licensing Unit would consider renewing R.F.'s license once it performed further home assessments. R.F. also agreed, as all foster parents do, that she would neither use corporal punishment nor delegate discipline of the children. (*Id.* at 142.) On April 8, 1999, after a licensing representative conducted a home visit, R.F. received a renewed license.

59. On April 6, 1999, the DCFS administrative hearing unit conducted a consolidated appeal on the expungement of the A sequence findings and the service appeal on the removal of the girls on January 30, 1998.[12] (*Id.* at 183 Group.)

60. In May and June 1999 respectively, Veronica and Andrea were moved to new foster care placements after their foster mother gave LSSI fourteen-day notices requesting their removal based on continued behavioral problems. (*Id.* at 184 Group.) They were not returned to R.F.'s home because of the outstanding A and C sequence findings.

61. On June 25, 1999, DCFS issued a final administrative decision affirming the December 1995 indicated report against R.F. (*Id.* at 183 Group, Ex. A.) R.F. filed an administrative review complaint in the Circuit Court of Cook County on July 28, 1999.

62. On April 12, 2000, while this case and R.F.'s administrative review action in

state court were pending, DCFS issued R.F. a "notice of intent" to revoke her foster care license. R.F. filed a timely appeal, and revocation proceedings are currently under way. (Pl.'s Mot. to Further Supp. the Record Regarding Four Class Members ¶ 26.)

63. On June 7, 2000 the presiding state court judge issued a decision in R.F.'s administrative review action, reversing the 1995 indicated report and ordering expungement. The state court order found that: (a) DCFS violated R.F.'s due process rights by failing to afford her a hearing on her appeal for over three years; (b) the legal standard for abuse and neglect had not been met; (c) the factual findings were against the manifest weight of the evidence; and, (d) the DCFS ALJ failed to consider the February 19, 1996 Administrative Hearing Unit Decision Memorandum which concluded that the record did not support the removal of the children without adequate notice. (*Id.* ¶ 30.)

### C. Plaintiff Pearce Konold

1. Pearce Konold, a sixty-one year old male, lives in Centralia, Illinois with his wife. He has three adult children. Konold is a clinical social worker, licensed in Illinois, and holds a Master of Social Work degree from the University of Denver. (Pl.'s Ex. Y at 282.)

2. In February 1990, Konold began working at the Hudelson Baptist Children's Home ("Hudelson"), a licensed child welfare agency affiliated with Central Baptist Children's Home and Family Services ("Central Baptist"). From February 1993 until November 1997, Konold served as the supervisor of residential services for Hudelson. (Pl.'s Ex. Y at 280.)

---

12. Closing arguments were re-scheduled from May 14 to May 28, 1999 after R.F.'s attorney failed to appear on May 14. (Pl.'s Ex. U at 183 Group, Ex. A. at 2.)

3. In this supervisory position, Konold was responsible for overseeing the operation of the residential program, including managing the three residential cottages, supervising three clinicians, and supervising residential staff. Konold had no day-to-day contact with the children living in the cottages. To some extent, then, Konold relied on the staff who provided services to the children to inform him of the children's progress or lack thereof at the facility.

4. In October 1996, DCFS assigned two ten-year old twin boys, J.W. and T.W., to Hudelson for services. The twins had a history of sexually aggressive behavior and came to Hudelson with a Sexually Aggressive Children and Youth ("SACY") treatment plan designed to protect them and other children from inappropriate sexual behavior. According to the investigator's interview notes of a meeting with Konold on October 30, 1997, Konold acknowledged that according to the initial SACY, the twins were not to room together. (*Id.* at 103.) Konold testified that because he felt this initial plan was "mediocre," he secured DCFS authorization for another evaluation.[13] In February 1997, George A. Ferguson, M.S.W., Q.M.H.P. (Qualified Mental Health Professional) reassessed the twins, and submitted a report recommending that "[i]deally [each twin] would be in a single bedroom and should have round-the-clock supervision with staff supervising bedrooms and showers to insure the safety of [each twin] and other children." (Pl.'s Ex. Y at 186, 194.) This report did not contain a prohibition on rooming the twins together if the "ideal" goal of placing them in single rooms could not be achieved. Nei-

ther SACY plan appears anywhere in the file sent to Konold.

5. The boys' cottage has four bedrooms. According to Hudelson's Executive Director, during the summer of 1997, a staff member at the cottage stayed awake during the night and the cottage was monitored by a motion-detection system. (*Id.* at 73.) According to Konold, he made repeated requests for an improved motion-detection system, but DCFS was unwilling to increase its funding of Hudelson, and Hudelson was unwilling or unable to make the requested improvements.

6. At a staff meeting on August 20, 1997, the staff responsible for the twins discussed Hudelson's need to rearrange rooming assignments in the boys' cottage. Konold himself, as well as Harry Gilley (a therapist for the boys cottage), Frances Rodriguez (a family teacher), and Paul Halford–Mechem (a family educator) were present at this meeting. J.W. and his roommate D.D. were not getting along, and the staff felt it needed to move one of the boys. At the meeting, the staff discussed J.W.'s perceived progress. It was noted that both twins had been visiting their parents and siblings with the approval of Lisa Palowski, the twins' DCFS caseworker, and that they were scheduled to return home by the end of the year. It was further noted that J.W. had not had a reported incident of sexually acting out in the past four to five months, had worked his way to the top of the behavior scale, and was considered a "role model" for the other boys. (*Id.* at 549, 595.) Based on this noted progress and the plan that the boys soon be reunited with their family, the staff decided that it would be clinically appropriate to allow the twins to room

---

**13.** Specifically, Konold testified that "[w]e were concerned about [the boys' difficulty separating themselves from each other] and wanted to have an evaluation on [their acting out] to help us develop a treatment plan that would be helpful in working with these boys." (Tr. 1074.)

together. Gilley opposed this arrangement, although it is not entirely clear from the record whether his disapproval was based on the SACY plan recommendations, nor even whether he mentioned the SACY plan at the meeting. (*Compare* Pl.'s Ex. Y at 111 *with* Tr. 1023–24.)

7. During the night of August 21, 1997, the first night the twins roomed together, the twins were disruptive, hiding another resident in their closet. (Pl.'s Ex. Y at 208, 258.) On this night, Frances Rodriguez had been performing bed checks every ten minutes. (*Id.*) Rodriguez discovered the third boy in the twins' closet when she heard a loud noise five minutes after having done a bed check. (*Id.*) The next morning, the third boy reported that he had engaged in sexual behavior with the twins during the previous night. (*Id.* at 259.) That same day, August 22, the twins were separated and D.D. and C.C., two other residents, were moved into the same bedroom.

8. On September 9, 1997, Hudelson staff learned that the twins had engaged in sexual activity with D.D. and C.C. throughout the summer. (*Id.* at 210, 239–40.) The boys admitted that they lied to staff in order to conceal the conduct and that on some occasions, they actively created disruptions or diversions requiring staff attention so that the other boys could engage in sexual activity. (*Id.* at 52–54, 90.) In a contemporaneous memorandum, Konold reported that when asked, D.D. indicated he did not say anything about the sexual activity because he was afraid of being hurt by J.W. (*Id.* at 213.) The staff had no knowledge of the activity, and agreed that none of the boys had behaved as though they were intimidated or scared of the others. (*Id.* at 43, 73, 85–88, 92–101.) Becky Johnson, DCFS liaison between the Department and Hudelson stat-

ed that "these [sexual] activities could not have been avoided." (*Id.* at 51.)

9. Upon becoming aware of the extent of the sexual conduct, Hudelson staff took several steps to address the situation. J.W. was removed from the cottage and placed in the diagnostic cottage, allowing the other boys to have single rooms. (*Id.* at 738.) Konold also testified that on September 11, 1997, he directed Gilley to call the DCFS Hotline to make a report.

10. DCFS assigned Arden Ancona and Jamie Ralph to investigate the report. During the course of the investigation, Ancona, Ralph or their supervisor, Terry Whipple, interviewed the boys and the staff at Hudelson. One of these three investigators spoke with Konold at least eight separate times between September 11 and November 13, 1997. (*Id.* at 37–38.) During his initial meeting with DCFS investigators on September 11, 1997, Konold testified that Ralph informed him about a new DCFS policy requiring the investigator to name an individual perpetrator in all residential program cases. (Tr. 1013–14.) None of the investigators told Konold that DCFS was investigating him as the suspected perpetrator of child abuse or neglect until November 13, 1997. In addition, no one at DCFS ever issued a CANTS 8 form to Konold, but instead issued one to the facility. (*Id.* at 136.)

11. On September 12, 1997, Ralph phoned Konold to inform him that he was recommending the report be unfounded. (*Id.* at 61.) Ancona's notes dated September 11, 1997 state that Whipple gave her permission to "initially unfound the report given." (*Id.* at 57.) In notes from an October 2, 1997 DCFS staffing on the Hudelson case, however, Whipple indicated that the "report should go to the formal stage." (*Id.* at 64.) On October 15, 1997, Ancona related this information to Konold in a telephone conversation and gave Konold a

list of Hudelson staff that DCFS would need to interview. (*Id.* at 79.)

12. In an interview on October 31, 1997, Gilley stated that, at the August 20, 1997 meeting where it was decided that the twins would share a room, he informed Konold of the SACY plan, but that Konold decided against it. Gilley stated that Rodriguez and Mechem went along with Konold, who he characterized as having "lapses in judgment" and "problems with decision making." (*Id.* at 111.) Mechem and Rodriguez acknowledged that Gilley opposed the room assignment, but did not recall Gilley mentioning the SACY plan at the meeting. (*Id.* at 112–13.) Konold testified that the SACY plan was not mentioned at the August 20, 1997 meeting. (Tr. 1023–24.) On September 10, 1997, when Gilley called D.D.'s DCFS caseworker Brian Hanebutt, Gilley indicated that the cause of the problem was "staff not being able to supervise the kids because there was not a staff person that was not sleeping when this happened. Staff was aware of the danger of the other 2 boys being possible sex perpetrators, but did not make special precautions to prevent this." (Pl.'s Ex. Y at 206.)

13. On November 13, 1997, Konold called Whipple to inquire about the status of the case. Whipple informed him that DCFS was going to indicate him as the perpetrator of child abuse and neglect. Whipple also informed Konold that the Licensing Unit would be notified of the indicated report. (*Id.* at 129.) According to the Family Assessment Factor Worksheet, DCFS indicated Konold for substantial risk of harm (allegation 22) and inadequate supervision (allegation 74). Konold testified that Whipple had explained to him for which allegations DCFS found him indicated, but that he was too "flabbergasted" to pay attention to the details. (Tr. 1026–27.)

14. Immediately after speaking with Whipple, Konold called his superior at Central Baptist, Pat Griffith, to inform her that Hudelson was not found indicated but that he himself would be indicated as a perpetrator. Griffith advised him not to come to work the next day, and then suspended him for the week following as well.

15. On November 21, 1997 DCFS investigator Ancona faxed a letter addressed to Konold to Central Baptist. The letter stated "I have found credible evidence to substantiate the allegation and have submitted an 'Indicated' finding to my supervisor for final approval." The letter further informed Konold that once the finding was approved, Konold would receive an "official notice" from Springfield. (*Id.* at 286.) This letter did not specify the allegations for which Ancona would recommend indicating the report, nor did it explain the appeals process.

16. Upon receipt of the letter, Central Baptist immediately terminated Konold's employment retroactive to November 13, 1997, but with pay through November 28, 1997. (*Id.* at 285.)

17. Konold testified that in the weeks following his receipt of the November 21 letter, he did not receive any "official notice" from DCFS. Accordingly, on December 17, 1997, Konold directed a letter to DCFS Appeals Coordinator, Nell Moskus, requesting an appeal on the finding indicated against him. In this letter, Konold stated that he had not yet received official notice of the indicated finding. (*Id.* at 20.)

18. On December 19, 1997 DCFS sent Konold a formal written notice of the indicated report and a redacted version of the investigative case file. (*Id.* at 316.) The notice stated that "[y]ou were identified as a person responsible for the child abuse or neglect," but did not inform Konold of the

specific allegations for which he was found indicated.

19. The redacted file received by Konold contained CANTS forms, some of which appear to name Konold as the perpetrator, and others which do not mention Konold's name at all. (*Compare* Pl.'s Ex. X 323–25 *with* 321–22, 327–30.) One of the CANTS forms appears to document that Konold was indicated for allegations 22 and 74 (*Id.* at 325), while another only identifies allegation 22. (*Id.* at 329.) The redacted file omits several pages, including the page of the FAFW report explaining the basis for the indicated finding.[14] (*Compare Id.* at 40 *with Id.* at 339–40.) The copy of the file provided to Konold in December 1997 only included a portion of the rationale for the indicated finding, which stated, "[d]ue to the fact that Pearce Konold blatantly disregarded the recommendations of the SACY Plan, SACY Evaluations and objections of the children's counselor, and placed the children together, it is recommended [that the inadequate supervision] allegation be indicated." (*Id.* at 339.) Moreover, the file sent to Konold did not include a copy of the 1996 SACY plan that appeared to provide the principal basis for the indicated findings. Konold testified that he requested from Central Baptist a copy of the SACY plan and other relevant documents, but that the agency denied his request because he was no longer employed by Central Baptist.

20. With the assistance of counsel, on February 16, 1998, Konold requested an internal review of the indicated report. (*Id.* at 5–12.) On March 25, 1998, DCFS upheld the indicated finding, reasoning that Konold "chose to ignore the SACY plan," and "chose to disregard the recommendations of the evaluations and children's counselor," and decided to room the twins together when "he should have known [that the arrangement] would lead to the sexual acting out between children." (*Id.* at 3–4.)

21. On April 2, 1998, Konold requested an administrative hearing on the report indicated against him. (*Id.* at 289.) In a letter dated April 9, 1998, the Chief ALJ at DCFS' Administrative Hearings Unit informed Konold that they could not schedule a hearing immediately because of a backlog of requests. The ALJ stated further that "approximately one month before the hearing, this office will send you a notice ... concerning the scheduling of the hearing." (*Id.* at 1.) The letter also directed Konold to Ed Wojnarowski[15] for discovery requests.

22. By letter dated April 14, 1998, Konold's attorney requested from Ed Wojnarowski all information and discovery in the matter. (*Id.* at 292.)

23. On July 2, 1998, Konold's attorney sent a letter to the Chief ALJ at the AHU explaining that Konold had not received any notification of a hearing, a violation of the Department's rule that a hearing date shall be scheduled within thirty calendar days of the request for an appeal. The letter explained further that Konold had

---

**14.** The missing page provided the explanation for indicating Konold. Konold was indicated for substantial risk of harm based on the decision to place the twins together in the same room. The DCFS investigator characterized this decision as an "obvious failure ... to protect children who are the known perpetrators of sexual abuse," because the decision was "contrary to the recommenda-

tions of the SACY plan that was in effect at this time .... and the boys' counselor objected to the placement of [the twins] in the same room." (*Id.* at 40.) DCFS provided a substantially similar rationale for indicating Konold for inadequate supervision. (*Id.* at 41.)

**15.** The letter does not explain Mr. Wojnarowski's position within DCFS.

not received any of the requested discovery materials, in violation of the Department's rules that the appellant have the right to examine and copy documents and to receive a witness list at least ten calendar days before the hearing. (*Id.* at 290–91.)

24. On September 14, 1998, more than five months after Konold had initially requested a hearing, DCFS sent Konold a notice informing him that a hearing had been scheduled for November 19, 1998. For reasons the record does not clarify, however, the hearing was postponed until March 4, 1999.

25. On March 16, 1999, after hearing a full day of testimony, the ALJ concluded that Gilley "was not credible when he stated he told [Konold] of the SACY protective plan on August 20, 1997." (*Id.* at 310.) The ALJ determined that the circumstances did not support an indicated finding as to either allegation. In her decision she wrote, "[i]t was clear ... that the twins ... were sexual predators who at any opportunity would distract staff so that they could perpetrate[,]" and that other children at Hudelson also "participated in the sexual activity, and assisted in diverting the staff and alarm systems ... The fact that the SACY plan was neglected for one night was but the tip of the iceberg[.]" (*Id.* at 313.) The ALJ concluded that the Department had not even made out a prima facie case against Konold, much less shown by the preponderance of the evidence that he was a perpetrator of child abuse or neglect, and recommended that Konold's request for expungement be granted. (*Id.* at 314–15.)

26. On March 23, 1999, nearly 18 months after Konold lost his job, Defendant McDonald adopted the ALJ's findings of fact and conclusions of law, and issued a final administrative expungement decision in Konold's favor. (*Id.* at 294.)

### D. Plaintiff M.K.

1. M.K. began providing home day care services in December 1993. DCFS issued her a day care license on April 13, 1994. M.K. is a proficient interpreter for the deaf, and has worked with special needs children and adults for twenty-five years. M.K.'s day care serves special needs children, including children with Down's Syndrome and emotional and behavioral disorders. M.K.'s husband, R.K., and her sister and daughter are also employed by the home day care business.

2. On April 24, 1994, the guardian of two children who attended M.K.'s day care, A.R. and C.R., aged four and three respectively, went to the local police station to report that the girls had been sexually abused by R.K and sexual exploited by M.K. and R.K. According to the police report, the girls recounted that, on April 22, 1994, R.K. and M.K. bathed them, took nude photos of them, and that M.K. "put a knife in the area of [C.R.'s] vagina." (Pl.'s Ex. S at 55.) M.K. testified that the girls had not attended her day care on April 22, and had not been attending for at least two weeks prior to that date.

3. On April 27, 1994, the same allegations were made in a call to the DCFS Hotline. (*Id.* at 45–46.) Tom Plach at Proviso Children's Advocacy Center performed VSIs with the two girls on April 28, 1994. Before interviewing the girls, Plach interviewed their guardian who stated that she has had custody of the girls for about a year after they were abandoned by their natural mother and that the girls were "exposed by their mother while she was with guys." (*Id.* at 47.) During the VSI, the girls stated that the K.'s took pictures of them and also alleged inappropriate touching and kissing. Notes from medical exams performed on girls on May

5, 1994, however, indicate that the exams revealed "no physical evidence of sexual abuse." (*Id.* at 71–72.)

4. On June 22 and 25, 1994, two months after the alleged incident of abuse, DCFS investigator Brand, the same investigator who worked on R.F.'s case, attempted unsuccessfully to interview the girls and the K.'s. (*Id.* at 58–60.) According to Brand's notes, on June 7, 1994, police officers told her that because nothing incriminating was found during execution of search warrant at the K.'s home, it would not be pursuing criminal charges. (*Id.* at 62.) When Brand did finally meet with A.R. and C.R. on June 28, 1994, she noted only that they had been interviewed already. (*Id.* at 63–65.)

5. On June 29, 1994, Brand interviewed M.K. and R.K., who denied the girls' allegations. According to Brand's notes, M.K. told her that shortly before the alleged incident, she had threatened the girls' guardian with a Hotline call because the girls' hygiene was poor. These notes reflect, further, that R.K. told Brand that since the allegations were made, the girls' guardian had again sought their babysitting services. In her notes, Brand writes that she told them both that "she would recommend [that the] case be unfounded but she changed her decision." (*Id.* at 66–67.) M.K. testified that Brand told her that the case would be unfounded and that she had nothing to worry about.

6. According to Brand's notes, in a July 8, 1994 conversation with Plach, Plach told Brand that the girls were credible during their VSIs and that, although police did not find pictures of the girls, they "found pictures of lots of other children."

7. R.K. received a letter from DCFS dated August 4, 1994 informing him that the report was indicated, and that he was identified as a person responsible for the child abuse or neglect. M.K. did not receive a separate letter, although her name appears on the letter addressed to R.K. (*Id.* at 13.) The letter provides no explanation of the allegations or the reason for indicating the report. The investigative file contained a FAFW which noted that both the K.'s were indicated for sexual exploitation (allegation 20), and that R.K. was indicated for sexual penetration (allegation 19). (*Id.* at 88.)

8. On August 8, and again on September 5, 1994, the K.'s requested an appeal of the findings and a copy of the report. (*Id.* at 14–15.) The K.'s did not receive a copy of their investigative file until June 26, 1995, ten months after requesting the file.

9. Nearly a year later, on May 3, 1996, a delivery man arrived at the K.'s to deliver a package. After leaving, the delivery man called the police to report that he witnessed R.K. being verbally abusive to the children in the home. (*Id.* at 126–27.) The police then visited the K.'s home and found nothing abnormal. R.K. admitted that he asked the children to move out of his way, but asserted that he did not yell at them. Moreover, M.K. testified that the delivery man himself behaved inappropriately. M.K. testified that the K.'s refused to accept the package because the charge was twice as much as they expected, and the delivery man responded by quoting Scripture and announcing that the K.'s were "going to Hell."

10. DCP assigned Walter Evans to investigate the report. On May 3, 1996, Evans visited the K.'s home and observed no "indicators of abuse or neglect." (*Id.* at 119.) In his notes of that visit, Evans also documented that he "did not attempt to interview [the children] due to their age." (*Id.*) On May 6, 1996, Evans obtained a copy of the prior indicated report, and informed the Licensing Unit of the current allegation and the prior indicated report.

(*Id.* at 106.) That same day, Evans sent a CANTS 21 form to the DCFS licensing coordinator and other DCFS personnel informing them that an allegation of risk of sexual harm had been made against the K.'s day care. (*Id.* at 128.)

11. On May 29, 1996, Evans recommended that the new allegations be indicated, stating as the sole reason for his decision, "caretakers previously indicated for [sexual abuse] of minors." (*Id.* at 99.) That same day, before his supervisor reviewed his recommendation, Evans reported to the DCFS Licensing Unit that the B sequence allegation was also indicated. In June 1996, various parents of children who attend the K.'s day care sent DCFS letters expressing their support for the services provided by the K.'s. (*Id.* at 130–33, 136.) It does not appear that Evans ever contacted these parents to interview them about whether their children ever mentioned baths or photos being taken at the day care.

12. Over two years after the initial allegations were made, beginning on May 29, 1996, the K.'s DCFS licensing representative informed them that their license was subject to an informal review based on the report indicating them for sexual abuse. After a June 14, 1996 meeting between the K.'s and their licensing representative, DCFS imposed a number of conditions for maintaining their license. One condition required the K.'s to be physically absent from their home during the hours that children were receiving day care services. (*Id.* at 165.)

13. On July 9, 1996, both M.K. and R.K. received letters from DCFS informing them that the B sequence report had been indicated against them, and that they were identified as persons responsible for abuse or neglect. Again, the nature of the indicated findings were not provided to the K.'s. (*Id.* at 139–40.) The K.'s filed their appeal of the B sequence findings on July 23, 1996. (*Id.* at 144–49.)

14. By letter dated September 6, 1996, DCFS sent the K.'s a copy of an internal review decision dated August 19, 1996, upholding the B sequence indicated findings for substantial risk of physical injury. While the reviewer stated that the evidence relied upon included interviews with the alleged victims, Evans noted that he *did not* interview the children because of their age. Furthermore, the internal decision relies solely on the sequence A indicated report to uphold the sequence B indicated findings. (*Id.* at 151.) On September 20, 1996, the K.'s requested an administrative hearing on the B sequence findings.

15. By letter dated September 23, 1996, DCFS sent the K.'s a copy of an internal review decision dated September 5, 1996, upholding the A sequence indicated findings. The rationale provided here was that "no new evidence [was] presented by appellant to contradict victim's statement," there was "no evidence that [the] children would have had motive to lie," and the "interview was done properly and in [a] neutral setting." (*Id.* at 152–53.) On September 27, 1996, the K.'s requested an administrative hearing on the A sequence findings. (*Id.* at 18.)

16. Nearly a year later, DCFS sent the K.'s a letter dated September 3, 1997, informing them that a hearing had been scheduled for September 15, 1997. (*Id.* at 156.) Because the K.'s did not receive the notice until September 9, 1997, they felt that did not have enough time to prepare for the hearing, especially in light of the fact that a letter from DCFS on September 27, 1996 stated that the K.'s would receive at least one month's notice. Therefore, the K.'s requested that the hearing be rescheduled. (*Id.* at 159.)

17. On October 16, 1997, when the B sequence appeal came before an ALJ, the judge concluded that the B sequence was dependent on the outcome of the A sequence appeal, and therefore set a hearing for both appeals on December 18, 1997. (*Id.* at 19.)

18. The K.'s then retained counsel, Diane Redleaf, who moved to expunge the indicated reports for DCFS's failure to provide a timely hearing, and requested copies of certain documents. Redleaf's request was denied, and M.K. never received a copy of an unredacted file.

19. After several months of not receiving a hearing date, DCFS voluntarily expunged both indicated reports against the K.'s on June 5, 1998, more than four years after the A sequence report was initiated. (*Id.* at 1.)

20. The K.'s suffered from the indicated finding and expungement delay in various ways. First, the K.'s grandsons used to visit the K.'s every summer, but were unable to do so while the indicated findings against the K.'s remained in the SCR. Second, the K.'s were forced to change the day care's goal of providing care for special needs children because the risk that such a child might fabricate events or be misunderstood rendered them dangerous to the K.'s.

### E. Plaintiff L.D.[16]

1. Plaintiff L.D. has been a licensed home day care owner and operator since 1994. L.D. is the mother of A.D., born October 14, 1982, and E.D., born June 2, 1981.

2. On January 7, 1998 a DCFS Hotline call was made alleging that A.D. had "licked [the] butt" of Alexis, a three-year-old child enrolled in the home day care. (Pl.'s Ex. BB at 109.) That same day, DCP Supervisor Sandra Roy notified the DCFS licensing coordinator of the allegation of sexual exploitation and risk of sexual harm being investigated against L.D.'s day care. (*Id.* at 167.)

3. The next day, Pamela Paulsen, the DCP investigator assigned to the case, visited the day care center where she interviewed L.D. and some of the children enrolled in the day care. L.D. denied that her son had done anything wrong and told Paulsen that "Alexis' home life is not the best." She also told Paulsen that Alexis had recently walked in on A.D. while he was masturbating in the bathroom. (*Id.* at 113.) Paulsen interviewed two children at the time, both of whom denied any inappropriate touching. (*Id.* at 115–16.) Also on January 8, 1998, Paulsen obtained a written statement from L.D. wherein she agreed that her son could not be in the home when the children were present. (*Id.* at 117.) This agreement is subsequently used as an addendum to the CANTS 21B Notification of Initial Protective Plan. (*Id.* at 169–70.) The agreement did not provide a duration for the protective plan. Later that same day, L.D. phoned Paulsen to tell her that when she confronted her son about the allegations he responded "how could anyone do that? ... She doesn't even wipe herself down there." (*Id.* at 119.)

4. On January 9, 1998, Tom Plach performed a VSI interview with Alexis. During this interview, Alexis added that she touched A.D.'s butt and licked his "tooney." She said that A.D. stated that she had "poo poo in there," and also said "mmmm" and "yummy butt." Alexis further related that she immediately told L.D.

---

16. Although the investigative file indicates that the parties involved in this case actually bear different initials, the court will use the initials designated to these persons by Plaintiffs' counsel.

and that A.D. "got soap in his mouth." (*Id.* at 146.) From the notes of the VSI, it appears that Plach asked suggestive questions such as whether "anything bad ever happened to [your] butt." During the interview, Alexis first indicated that the incident happened in A.D.'s room in the presence of his teenage sister; later Alexis said it happened in the living room. (*Id.*)

5. Paulsen spoke with some parents, including Alexis' mother, all of whom reported either that they could not imagine A.D. doing this, or that they did not believe the allegations. (*Id.* at 122–26.)

6. On January 13, 1998, Paulsen spoke with an unnamed medical provider who examined Alexis and found no medical evidence of sex abuse. According to Paulsen's notes, the medical provider also related that Alexis said A.D. licked her butt, and pointed to her vaginal area. (*Id.* at 127.)

7. In her notes from a meeting with her supervisor on January 15, 1998, Paulsen wrote that the "kid's mom had made comments about the dog licking its own butt four weeks ago." (*Id.* at 127.)

8. On January 22, 1998, A.D. arrived at the police station with his attorney. A.D. invoked his fifth amendment rights after being taken into custody. He was arrested and charged with aggravated criminal sexual abuse and released to his attorney. The reporting officer wrote "Arrestee was brought to the police station ... at [reporting officer's] request after arrestee was identified by the victim as the offender who committed a criminal sexual abuse offense against the victim." (*Id.* at 149–150.)

9. On January 23, a number of parents of children who attend L.D.'s day care petitioned to allow A.D. to return to his home before and after school.

10. On February 3, 1998, Paulsen interviewed A.D. for the first time, nearly a month after the Hotline call was made. A.D. denied the allegations, saying also that he had changed A.D.'s diapers, allowed her to watch TV in his room and "goofed around" with all the children. (*Id.* at 135–36.) He also related the masturbation story. (*Id.*) According to Paulsen's notes of an interview with Alexis' mother, A.D. told Alexis' mother that he "pinched Alexis' butt" one time while they were playing. (*Id.* at 123.)

11. On February 17, 1998 Paulsen completed the FAFW, recommending that the allegations against A.D. for sexual molestation (allegation 21) and risk of sexual harm (allegation 22) be indicated. (*Id.* at 182.) The sole rationale provided was "Alexis made a spontaneous disclosure that [A.D.] licked her butt. Alexis told her mother, doctor and Tom Plach." (*Id.* at 185.) On February 19, 1998, Paulsen phoned L.D. to tell her that the case was indicated. The notes of the phone conversation do not detail whether L.D. was informed of the specific allegations indicated, the rationale or the retention period. (*Id.* at 142.) Paulsen's supervisor did not approve the indicated finding until March 5, 1998. (*Id.* at 185.)

12. A.D. received a notification of the indicated report from DCFS in a letter dated March 12, 1998, informing him that he was found responsible for child abuse or neglect. (*Id.* at 104.) L.D. appealed the finding on A.D.'s behalf on March 24, 1998 and requested a copy of the investigative file.

13. On April 3, 1998, DCFS sent A.D. and L.D. a copy of the CANTS 2 form and advised them that the rest of the file would be sent "as soon as possible." (*Id.* at 6.) When the materials had not arrived within thirty days, L.D. renewed her request for information. DCFS sent the investigative

file on May 11, 1998, informing A.D. and L.D. that they had forty-five days to further appeal. (*Id.* at 3.) L.D. filed a child protection appeal form on June 10, 1998.

14. On July 7, 1998, DCFS issued an internal review decision upholding the indicated reports against A.D. The reviewer relied on A.D.'s arrest and the statement of Alexis, which she deemed credible to uphold the findings. (*Id.* at 190–91.) DCFS finalized the internal review decisions and sent a letter to A.D. on July 13, 1996. On July 28, 1998, A.D. requested an administrative hearing regarding the indicated allegations. (*Id.* at 188.) Although A.D. had not been informed about the length of time an indicated report would remain registered, DCFS registers indicated findings of sexual abuse for twenty years.

15. A year later, on July 26, 1999, an ALJ granted A.D.'s motion to dismiss, ruling that A.D. was not given proper notice as required by DCFS rules, and ordered the indicated reports against A.D. expunged. (Ex. LL at 26.)

## VI. Effect of the Challenged Policies on Providers

### A. Day Care

1. According to Maria Rosa Salazar, due to the economic conditions under which day care homes operate, an investigation or an indicated report against a day care home owner is reasonably likely to cause the loss of the business altogether because parents may drop their children from the program. The investigation process itself imposes significant time costs and burdens on the program. (Salazar Rep. at 17–29.) Indeed, the Dupuys [17]

were forced to file for bankruptcy, and pursuant to a safety plan, were required to limit the number of children they served and the hours they operated, nearly closing their business. Furthermore, an indicated report against a day care employee will prevent continued employment in the field for as long as the report remains indicated, unless a waiver is granted by the Department. (Pls.' Ex. NN, Conlee Dep., Ex. 41.)

### B. Child Welfare Agencies

1. Child welfare agencies commonly terminate an employee after receiving information from DCFS that it has indicated the employee as a perpetrator of child abuse or neglect. (Pls.' Ex. UUU, Graph 5.) For example, Central Baptist terminated Pearce Konold upon notification that an investigator recommended the report be indicated against him. If the employer continues to employ the indicated perpetrator without a waiver, the Licensing Unit is required to take enforcement action against the employer, including conditional licensing, a corrective plan or license revocation. (Pls.' Ex. NN, Conlee Dep., at 79–80.)

### C. Foster Care and Relative Care

1. DCFS pays foster care benefits on behalf of each child placed in a foster home who is a DCFS ward. While the benefits are intended to be used for the child, foster parents are allowed to use the benefits to pay common household expenses such as rent or mortgage payments, utilities and shared food expenses for the household. According to Plaintiffs' expert Melissa Williams, foster parents often come to depend on these benefits for com-

---

17. The Dupuys experienced a situation similar to L.D. in that Belinda Dupuy operated a day care and her daughter, S.D., was accused of sexual abuse. In order to avoid losing her day care license, Belinda agreed to a protective plan whereby she was limited to 14 children and her young daughter would remain out of the house from 7 a.m. to 9 p.m.

mon living expenses. (Williams Rep. at 9.) As such, an indicated report can have a significant financial impact on the members of a foster home. (*Id.* at 26.)

2. Despite attachment to foster parents, an indicated report is likely to cause the removal of the child in a substantial percentage of cases. (Williams Rep. at 16.) As illustrated by R.F.'s case, DCP workers may direct a removal with which the child's caseworker disagrees.

3. If a child is removed from a foster home in which the child has formed an attachment, the rupture of that attachment can be extremely traumatic for the child. (Williams Rep. at 17–18.)

4. A pending or indicated report is a ground for denial of an application for a foster home license, and may be grounds for precluding additional placements.

## DISCUSSION

Something is seriously and obviously flawed in a system where 75% of those child care employees who appeal an indicated finding against them have such a finding overturned or voluntarily expunged by the State months, sometimes even years, later. During the agonizing and frustrating period between accusation and exoneration, these individuals, labeled by the State as perpetrators of child abuse and/or neglect, lose not only their pride and reputation, but often their livelihood as well. Moreover, the child care employees are not the only ones harmed; as the court explains below, current DCFS policies and procedures also, for two impor-

tant reasons, harm the children of Illinois. First, when a caregiver is unjustly indicated, and consequently barred from any contact with the children for whom he or she cared, it is the children who lose the benefit of a stable environment. The court is also concerned that while the appeal of an indicated individual languishes in the administrative process, actual perpetrators, not targeted during cursory investigations, remain at work in the child care field. Nor does the court share Plaintiffs' conviction that all those class members whose findings have been expunged are in fact innocent. The extraordinary delays may well result in exoneration of guilty parties.

While DCFS no doubt has reason to be overcautious in its identification of the abuse and neglect of Illinois' children, the court concludes it must promptly review and revise its policies and procedures to best ensure that alleged perpetrators of such abuse and neglect receive constitutionally adequate process *before* they are forced to endure the consequences of their alleged actions. The remainder of this opinion, which ultimately upholds Plaintiffs' request for a preliminary injunction, details where and how the present system has failed, and directs DCFS to coordinate with Plaintiffs to develop a workable solution within 60 days.

### A. Preliminary Injunction Standard

 Plaintiffs ask this court to issue a preliminary injunction which would prohibit Defendant, a state official, from continuing to implement the challenged policies and practices of DCFS.[18] A party seeking

---

**18.** Defendant claims that the Eleventh Amendment of the U.S. Constitution precludes such a remedy. Official capacity suits like this one, however, that seek only injunctive relief, are permitted by 42 U.S.C. § 1983, and not forbidden by the Eleventh Amendment. *See Power v. Summers,* 226 F.3d 815, 819 (7th Cir.2000) (citing *Ex Parte Young,* 209

U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Defendant argues that Plaintiffs do not qualify for this *Ex Parte Young* exception to the Eleventh Amendment because they are seeking to enjoin past, as opposed to continuing, conduct. Defendant believes that the amendments to DCFS regulations, *see* ILL. ADM. CODE tit. 89, § 336 *et seq.* ("Amended Rule 336"),

a preliminary injunction must, as part of its threshold showing, demonstrate (1) a likelihood of success on the merits; (2) irreparable harm if the preliminary injunction is denied; and (3) the inadequacy of any remedy at law. *See Cooper v. Salazar,* 196 F.3d 809, 813 (7th Cir.1999) (affirming, in a § 1983 due process action, a preliminary injunction against the implementation of changes in administrative procedures used by Illinois Department of Human Rights in evaluating discrimination claims). When these threshold tests are met, the court must then balance (4) the harm to the plaintiffs if preliminary relief were wrongfully denied against the harm to the defendant if the injunction were wrongfully granted; and, (5) the impact on persons not directly concerned with the dispute (the public interest). *See id.*

## B. Likelihood of Success on the Merits

The court addresses, first, Plaintiffs' likelihood of success on the merits. For purposes of review, Plaintiffs include "child care employees" (e.g., day care givers, foster care givers, social workers) and family members (parents, children, other family living in the home) whom DCFS has indicated as perpetrators, or against whom it has imposed protective plans. This motion, however, seeks preliminary relief only for the child care employees. These individuals claim that three core DCFS policies-the Indicated Report Decision–Making Policies, Notice and Hearing Policies, and Disclosure and Use Policies-and five "special" DCFS policies-protective plans,

foster care placement holds, "not responsible findings," the extended registry of indicated reports, and indicated findings without determinations of wrongful intent or conduct-violate their procedural and substantive due process rights under the Fourteenth Amendment. The court addresses Plaintiffs' procedural and substantive due process arguments separately and in turn.

### 1. Procedural Due Process

■■■■ In a procedural due process claim, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty or property, and that state action has deprived him or her of that interest. *See* U.S. CONST. amend. XIV, § 1. The analysis, therefore, involves two steps: the court must first determine whether the defendant deprived the plaintiffs of a protected liberty or property interest, and if so, the court assesses what process was due. *See Brokaw v. Mercer County,* 235 F.3d 1000, 1020 (7th Cir.2000) (citing *Hamlin v. Vaudenberg,* 95 F.3d 580, 584 (7th Cir.1996)).

### a. Protectible Interest

The protectible interest issue has already been addressed by the court. Upon Defendant's motion to dismiss, Judge James Holderman, who originally presided over this case, determined that Plaintiffs possessed two distinct protectible interests: (a) a liberty interest in making choices and decisions regarding one's children; and (b) a property interest in an occupational license that was or may be

---

effectively render Plaintiffs' claims moot. The court agrees that, if the conduct Plaintiffs were seeking to enjoin was not still in effect, their action would be barred by the Eleventh Amendment. *See Vickery v. Jones,* 100 F.3d 1334, 1346 (7th Cir.1996). The harm, however, alleged by Plaintiffs, is continuing. For example, notwithstanding Amended Rule 336,

DCFS allows indicated reports, predicated on a relatively low "credible evidence" standard, to be distributed to present and prospective employers. Because Plaintiffs claim that this practice, among others, violates their due process rights, the case falls within the *Ex Parte Young* exception.

revoked because of an indicated report. *See Smith v. McDonald*, No. 97 C 4199, 1998 WL 259536, at *3–5 (N.D.Ill. May 5, 1998) (*"Dupuy I "*). The two interests identified by Judge Holderman, however, are not entirely applicable to Plaintiffs in this case. The first, essentially a liberty interest in familial relationships, may appear to be implicated in a circumstance such as L.D.'s. L.D. was the home day care operator who, threatened with the possible revocation of her license, agreed that her teenage son would not enter her home whenever children were present. As will be demonstrated herein, however, *see infra* Discussion, Section B(1)(b)(iv), despite any implicit, or even explicit, threat to one's license, the court finds that a protective plan is a voluntary arrangement, albeit one that may be painfully difficult, and, consequently does not constitute a governmental interference with familial relations.

As for the second protectible interest, a property interest in an occupational license, the court recognizes that Plaintiffs such as Pearce Konold (a clinical social worker licensed by the State), R.F. (a foster parent licensed by the State),[19] and M.K. (a home day care provider licensed by the State) possess governmental licenses; but, it is not the threat of losing the occupational license or the procedures in place to revoke such licenses that Plaintiffs such as Pearce Konold, R.F., and M.K. are challenging.[20] Instead, it is the fact that

their indicated report, while maintained in the SCR, effectively prevented them from continuing to work in the child care field.

■ It is, therefore, necessary for this court to decide if the opportunity to obtain employment in one's chosen profession is a constitutionally protected liberty interest. It is well-settled law that damage to a person's reputation alone is not sufficient to implicate a federal liberty interest. *See Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Judge Holderman noted as much in *Dupuy I. See Dupuy I*, 1998 WL 259536, at *4 ("[a]n injury only to a person's reputation is not a protected liberty or property interest.") (citing *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). The Seventh Circuit, however, has recognized that a plaintiff can demonstrate a liberty interest if, in addition to merely damaging one's reputation, the government "charge[s] him with immorality, dishonesty, or the like, or otherwise stigmatize[s] him in a way that foreclose[s] future employment opportunities." *Fittshur v. Village of Menomonee Falls*, 31 F.3d 1401, 1409 (7th Cir.1994); *see also Pleva v. Norquist*, 195 F.3d 905, 915 (7th Cir.1999) ("When the government removes someone from a position for stated reasons likely to make him all but unemployable in the future, by marking him as one who lost his job because of dishonesty or other job-related moral turpitude, the consequences are akin to de-

---

**19.** It is important to note that any property interest a foster parent may have in his or her State license is separate and apart from any liberty interest a foster parent may allege in the relationship with his or her foster child. While it is not necessary here for the court to decide on the rights of a foster parent-foster child relationship, Supreme Court and Seventh Circuit precedent indicate that such a relationship is not constitutionally protected. *See Procopio v. Johnson*, 994 F.2d 325, 328–29 (7th Cir.1993) (citing *Smith v. Organiza-*

*tion of Foster Families for Equality & Reform*, 431 U.S. 816, 843–44, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977)).

**20.** Currently, before a State licensing body may revoke a license, it must afford an individual notice, a hearing, and a right of appeal. *See, e.g.*, Clinical Social Work and Social Work Practice Act, 225 ILCS 20/1 (provides for notice of revocation and, upon request, a hearing); Child Care Act of 1969, 225 ILCS 10/9 (same).

priving him of the ability to follow his chosen trade, and due process must be provided."); *Lewis v. Dep't of Children & Family Servs.*, No. 93 C 2908, 1994 WL 270265, at *2 (N.D.Ill. June 15, 1994) (finding that in order to state a protected liberty interest, a plaintiff must establish that the injury to his reputation was "publicly disclosed and that this public disclosure caused the subject a tangible loss of other employment opportunities.").

While *Fittshur* involved an assessor of real estate terminated by a municipality, various courts have specifically recognized the ability to pursue employment in the child care field as a constitutionally protected liberty interest. *See, e.g., Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir.1994) ("We hold that Valmonte has adequately stated a cause of action for deprivation of a liberty interest not merely because of the defamatory aspect of the Central Register, but because that defamation occurs in conjunction with a statutory impediment to employment."); *see also Petition of Preisendorfer*, 143 N.H. 50, 719 A.2d 590 (1998); *Cavarretta v. Department of Children & Family Servs.*, 277 Ill.App.3d 16, 214 Ill. Dec. 59, 660 N.E.2d 250 (1996); *In re Lee TT v. Dowling*, 87 N.Y.2d 699, 642 N.Y.S.2d 181, 664 N.E.2d 1243 (1996). Because it discusses the facts of *Valmonte* in the next section, *see infra* Discussion, Section B(1)(b)(i), the court briefly discusses here only the facts of *Preisendorfer, Cavarretta*, and *Lee T.T.* In *Preisendorfer*, the petitioner, a school special education aide who assisted in running a child care center, was indicated for sexual abuse of a child based on a "probable cause" standard. *Preisendorfer*, 719 A.2d at 591. He argued that, by including him in the state's central registry based on a mere "probable cause" standard, the New Hampshire Division for Children, Youth and Families unconstitutionally deprived him of his liberty interest in his profession. *Id.* at 592. The

court found that "[t]he panel's decision to enter the petitioner's name into the registry essentially barred him from working with children, and caused him to become unemployed and unemployable in his profession. Thus, his interest in his profession is a protected interest." *Id.* (internal citation omitted). Similarly, in *Cavarretta*, the plaintiff, a high school teacher, was indicated for sexual abuse on the basis of a "credible evidence" standard. *Cavarretta*, 277 Ill.App.3d at 19, 214 Ill.Dec. 59, 660 N.E.2d at 252. Then, 581 days after he appealed the decision to indicate him for abuse, and 169 days after the last day of testimony in his hearing on appeal, the ALJ, also using a "credible evidence" standard, denied his request for expungement of the record from the State register. *Id.* at 20, 214 Ill.Dec. 59, 660 N.E.2d at 253. Affirming a decision that DCFS violated the plaintiff's due process rights, the Appellate Court of Illinois concluded that "[b]eing placed on the State register of suspected child abusers is not merely a negative reference from a previous employer. Instead ... the report could, effectively, preclude the plaintiff from working in any capacity in his chosen profession and in the child care profession as well." *Id.* at 24, 214 Ill.Dec. 59, 660 N.E.2d at 255. Finally, in *Lee T.T.*, petitioners, who were indicated for various reasons under a "some credible evidence" standard, sought to have their names expunged from the New York State Central Register. 87 N.Y.2d at 702, 704, 642 N.Y.S.2d 181, 664 N.E.2d 1243. The Court of Appeals of New York, which ultimately ordered the New York Department of Social Services "to substantiate reports of child abuse by a fair preponderance of the evidence before [disseminating them] to providers and licensing agencies," *id.* at 712, 642 N.Y.S.2d 181, 664 N.E.2d 1243, determined that "the inclusion of petitioners in the Central Reg-

ister not only harmed their personal reputations, it affected their present employment and effectively foreclosed them from any future employment in the child care area." *Id.* at 709, 642 N.Y.S.2d 181, 664 N.E.2d 1243.

■ The court agrees that the pursuit of work in one's chosen profession constitutes a recognizable and protected liberty interest, and finds that Plaintiffs were deprived of such an interest. Whether it be by way of their enforcement of mandatory background checks on prospective employees or "Notices of Presumptive Unsuitability" sent to current employers, DCFS policies and procedures clearly effectuate an indicated perpetrator's exclusion from the child care profession. This conclusion is illustrated by the unfortunate experiences of Pearce Konold and A.H. On November 21, 1997, DCFS faxed a letter addressed to Konold to his employer, Central Baptist. The letter notified Konold that a finding would be indicated against him. Upon receiving this letter, Central Baptist immediately terminated Konold. After being terminated, Konold was forced to apply for positions that did not serve children. He consequently applied for positions with nursing homes and elderly care agencies. These entities would not hire him, however, because his license was at risk. Similarly, after A.H. was indicated for the abuse of P.O., she was also unable to find employment in the child care profession. She sought employment with two agencies that employ child care workers, but because both agencies asked about her prior involvement with DCFS, she was not permitted to apply for the positions. Given that Plaintiffs have stated a recognizable, constitutionally-protected interest, the court must determine whether the procedures used to deprive Plaintiffs of this interest were constitutionally adequate.

### b. What Process is Due?

Upon review of the DCFS policies and procedures challenged by Plaintiffs, the court finds that these policies, in conjunction, are not constitutionally adequate. The court discusses each set of challenged policies separately.

### i. Indicated Report Decision–Making Policies

Plaintiffs raise four challenges to the indicated report decision-making policies, the policies that govern the investigation process and the decision by investigators as to whether or not to indicate reports of abuse and neglect. First, Plaintiffs claim that the policies do not allow Plaintiffs a fair determination on the merits at the investigation stage because investigators are not adequately trained or directed to gather and develop exculpatory evidence. In particular, Plaintiffs claim that investigators are not trained on how to weigh evidence, that there is no requirement that investigators have any particular advance training in child development, and that there is no enforcement mechanism when investigators fail to meet their continuing education requirement. Second, Plaintiffs argue that these policies do not provide for impartial investigations because the same investigator charged with gathering evidence against alleged perpetrators ultimately "adjudicates" their guilt by deciding whether or not to indicate a report. Third, in what probably represents their strongest argument, Plaintiffs attack the "credible evidence" standard whereby, they claim, "any" credible evidence is sufficient to indicate a finding. And, fourth, Plaintiffs assert that these policies incorporate the following unconstitutional presumptions: (a) some credible evidence is enough to presume that an individual is a perpetrator of child abuse and/or neglect; (b) some credible evidence is enough to presume that an employee is unfit for em-

ployment or licensure; and (c) if a child has been touched or injured, it is enough to presume that a named perpetrator committed child abuse and/or neglect.

The court finds each of these policies and procedures generates concern, but focuses its energies on what it considers to be the most troublesome, the "credible evidence" standard necessary to indicate a finding. "Credible evidence," according to DCFS regulations, means that "the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." ILL. ADMIN. CODE tit. 89, § 336.20. Plaintiffs argue, and the record buttresses this point, that investigators interpret this standard to mean that "any" credible evidence of abuse or neglect is sufficient, and thus, investigators gather only inculpatory evidence and disregard any evidence weighing against an indicated finding. For example, in the case of A.H., the investigator decided to indicate a finding of abuse based on the statements of two physicians, even though there was considerable evidence to the contrary. The child's pediatrician and grandfather (a retired surgeon) concluded that the injury could well have been caused by one of the child's nocturnal seizures, the child's mother insisted that A.H. provided exceptional care, and another person for whom A.H. had worked also stated that A.H. provided excellent care.

Likewise, the K.'s (M.K. and her husband, R.K.) were also indicated despite solid exculpatory evidence: Notably, the girls were not at the K.'s day care, and had not been there for several days, on the date the abuse was reported to have occurred. Further, while the guardian for a three and four year old alleged that the children had been sexually abused by R.K. and sexually exploited by the K.'s, medical exams revealed no physical evidence of abuse. Moreover, M.K. told the DCFS investigator that (1) she had recently threatened the children's guardian with a Hotline call because of their poor hygiene, and (2) the guardian had sought the K.'s services after having made the allegations. There is no evidence that the DCFS investigator attempted to corroborate this information prior to "indicating" the K.'s.

While these examples demonstrate why the "credible evidence" standard is objectively problematic, the court must look to the law to determine whether such a standard is constitutionally adequate. To do this, the court applies the three-factor test set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Pursuant to *Mathews*, a court balances (1) the nature of the private interest affected by the official action; (2) the risk of error and the effect of additional procedural safeguards; and (3) the governmental interest. Such an analysis has already been performed by the Second Circuit in *Valmonte, see Valmonte*, 18 F.3d at 1002–04, and the court thus looks to *Valmonte* for guidance. In *Valmonte*, the plaintiff, seeking to represent a class of individuals whose names were listed on New York's Central Register, claimed that her inclusion on the list violated her Fourteenth Amendment right of due process. *Valmonte*, 18 F.3d at 995. Specifically, the plaintiff argued that "the existing procedures violate due process by prohibiting expungement of a subject's indicated record if there is 'any credible evidence' to support the allegation and only holding the county DSS to a higher 'preponderance of the evidence' standard *after* a subject loses an opportunity for employment." *Id.* at 1002 (emphasis in original).

In performing its *Mathews* analysis, the *Valmonte* court first weighed the plaintiffs' private interest in pursuing employment in

the child care field. The court deemed this a serious and legitimate interest. It then considered the countervailing state interest in protecting children from abuse and maltreatment, and, citing *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), found that "children are often victimized, and that the state has a strong interest in protecting them from the infliction of physical harm by those charged with their care." *Valmonte*, 18 F.3d at 1003. Because the plaintiffs and the State both had strong interests, the *Valmonte* court considered the deciding factor to be the "enormous risk of error that ha[d] been alleged by Valmonte and acknowledged by the appellees." *Valmonte*, 18 F.3d at 1003. According to the allegations in *Valmonte*, nearly 75% of those who sought expungement of their names from the Central Register, after a "credible evidence" finding against them, were successful. *Id.* The court wrote that this error rate was caused by the "credible evidence" standard which "does not require the factfinder to weigh conflicting evidence [and] merely requir[es] the local DSS to present the bare minimum of material credible evidence to support the allegations against the subject." *Id.* at 1004.

The situation is no different here. Plaintiffs have serious and legitimate private interests, such as their liberty interest in pursuing employment in the child care field. Defendant has an equally powerful countervailing interest in the protection of children. *See Darryl H. v. Coler*, 801 F.2d 893, 902 (7th Cir.1986) ("[T]he state's interests [in protecting children] are ... extraordinarily weighty."). In fact, Defendant cited the expert testimony of two witnesses, Dr. Michelle Lorand (an expert in pediatrics, including the treatment and care of abused and neglected children) and Richard Calica (an expert in child welfare and child abuse and neglect), who claim that raising the level of proof

required to indicate a finding would result in more children being injured or re-injured.

Because Plaintiffs and the State each have weighty interests, the court, as the Second Circuit did in *Valmonte*, focuses on the risk of error inherent in the "credible evidence" standard. Plaintiffs have offered unrebutted evidence that 74.6% of indicated findings that are challenged are ultimately reversed on review-almost the exact same error rate as that alleged in *Valmonte*. The court is confident that this staggering expungement rate is due to the relatively low standard of proof required to indicate a finding, combined with the indefensible delays that allow memories to fade and, therefore, evidence to become unreliable, *see infra* Discussion, Section B(1)(b)(ii), and, for this reason, directs DCFS to modify its policies and procedures.

In entering this directive, the court emphasizes that use of a "credible evidence" standard at the investigation stage is not, by itself, impermissible. It is only when the indicated finding is disclosed to licensing agencies and present and prospective employers that the relatively low "credible evidence" standard sinks below the level of due process. *See Preisendorfer*, 719 A.2d at 594 ("The New York State Department of Social Services may retain records and continue investigations when allegations are supported by some credible evidence, but it must prove child abuse by a fair preponderance of the evidence before distributing the reports to providers and licensing agencies as a screening device for future employment.") (quoting *Lee TT.*, 642 N.Y.S.2d 181, 664 N.E.2d at 1252.). If DCFS, through its dialogue with Plaintiffs, decides that a modification to the "credible evidence" standard is the most effective way in which to ease the court's concerns, the court emphasizes its expectation that

any such modification will be accompanied by a program through which DCFS will adequately train its investigators on these revised policies and procedures.

### ii. Notice and Hearing Policies

The court moves next to DCFS' Notice and Hearing Policies. As already noted, if an investigator, under the "credible evidence" standard, determines that a perpetrator caused abuse or neglect, DCFS forwards the finding for inclusion in the SCR. Plaintiffs argue that DCFS does not provide indicated perpetrators with constitutionally adequate notice of the finding against them [21] or offer them a meaningful opportunity to contest such a finding.

Specifically, Plaintiffs claim that the SCR Notice, issued to the perpetrator after the report has been indicated in the SCR, does not identify the evidence supporting the indicated finding or inform the named perpetrator as to how long the specific finding against him or her will remain registered. As for their opportunity to be heard, Plaintiffs claim that DCFS' policies and procedures are unconstitution-

al because (a) indicated perpetrators only have fifteen days to appeal an adverse internal review determination; [22] (b) an alleged perpetrator's failure to file an appeal in a timely manner constitutes a permanent waiver of such appeal; [23] (c) appellants only have access to heavily redacted files which seriously compromises their ability to adequately present a case; (d) an appeal does not stay inclusion of an indicated report in the SCR or the disclosure of the indicated report to employers or licensing authorities, and (e) the appeals process takes an average of 657 days from the date upon which the initial request for an appeal is filed.

Under the Constitution, a deprivation of life, liberty, or property must "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Staples v. City of Milwaukee,* 142 F.3d 383, 385–86 (7th Cir.1998). The court finds that the SCR Notices received by Plaintiffs and the heavily redacted in-

---

**21.** In addition to the SCR notice, Plaintiffs have contested the adequacy of the notices that DCFS provides, or does not provide as the case may be, to suspected perpetrators during the investigative process. In particular, Plaintiffs allege that: (a) during the investigation, the investigator often does not, as he or she is supposed to, always provide the subject with a CANTS 8 form and a brochure explaining the form; (b) even when a CANTS 8 form is provided to the subject, it does not identify the specific target of the investigation, detail the allegations, or inform a recipient that failure to speak with an investigator may result in an indicated finding against him or her; and (c) the same CANTS 8 form is provided to every subject of the investigation, regardless of whether he or she is a suspect of the alleged abuse or neglect. Given the severe ramifications of an indicated finding, the court finds that these deficiencies, to the extent that they remain an issue, must be addressed and remedied in the dialogue between the parties.

**22.** To the extent that Amended Rule 336 has eliminated the internal review step of the appeals process, this particular challenge is moot.

**23.** According to Amended Rule 336, the Chief Administrative Law Judge or the Administrative Law Judge shall dismiss an appeal when "the request for the appeal was not received within 60 calendar days after the postmarked date of the notice [from the SCR] that the report was indicated." ILL ADMIN. CODE tit. 89, § 336.190. As long as the notice provided to an indicated perpetrator complies with ILL. ADMIN. CODE tit. 89, §§ 336.30 and 336.40, adequately describes the basis for the indicated finding, and informs Plaintiffs of their rights to contest such a finding, the court considers the 60–day deadline entirely permissible.

vestigative files that, sooner or later, accompanied such notices, were not constitutionally adequate. Again, examples are helpful. In January 1996, DCFS caseworker Capucine Tigner decided to indicate a report of neglect against R.F., and, simultaneously, remove from R.F.'s home five of the six foster children in her care. R.F., however, did not learn of the indicated report against her until a March mediation hearing regarding the return of the foster children to her home. The K.'s experienced similar frustration with DCFS notices or, more accurately, lack thereof. On or around August 4, 1994, R.K. received a letter from DCFS informing him that a report was indicated and he was identified as a person responsible for abuse or neglect. The letter, however, did not mention how long the indicated report would remain in the SCR or provide even the slightest explanation of the allegations or the reasons for indicating the report.

Granted, since the preliminary injunction hearing, the rules governing the SCR Notice have been amended. The SCR Notice now must include, among other things, "the allegations determined indicated," "[the] length of time the indicated case shall be retained by the Department," and "a statement that, if a review of the Department's decision is desired, it must be requested in writing within 60 days after notification of the completion of the investigation by the Child Protective Service Unit ...." ILL. ADMIN. CODE tit. 89, § 336.30. Furthermore, DCFS must, within 10 days after a final determination has been entered into the SCR, "provide clear instructions [to the alleged perpetrator] on how to request and receive an administrative hearing." ILL. ADMIN. CODE tit. 89, § 336.40. These amendments are a step in the right direction, but the court cannot assume that its intervention is unnecessary without evidence that Amended Rule 336 has, in fact, generated consistent and adequate notification to indicated perpetrators.

The court is even more concerned, however, about the inexcusable delays experienced by Plaintiffs in attempting to appeal, and seek expungement of, the indicated findings against them. As has been stated, one of the requirements of due process is for a hearing at a meaningful time. See Loudermill, 470 U.S. at 547, 105 S.Ct. 1487. At the time of the preliminary injunction hearing, DCFS regulations stated that an administrative hearing would be provided to an appellant within 30 days of a request. ILL. ADM. CODE tit. 89, § 335.110(d)(1). The AHU, however, routinely sent appellants a letter informing them that while DCFS had received their hearing request, it could not schedule a hearing promptly due to a backlog. A.H., R.F., Pearce Konold, and the K.'s all, likely due to this backlog, suffered unreasonable delays. A.H. sent a letter to DCFS on January 6, 1998, informing it of her intent to appeal the indicated finding against her and requesting a copy of the investigative file on her case. She did not receive a copy of her file, however, until January 28, 1999, when her deposition was taken by DCFS in connection with this litigation. Moreover, she did not receive a hearing to contest the finding until July 7, 1999, six months after her request. Then, on August 11, 1999, before the hearing resumed, and over a year and a half after she informed DCFS of her intent to appeal, DCFS voluntarily unfounded the report against A.H.

As for R.F., on March 4, 1996, she formally requested an appeal of the indicated finding against her. DCFS did not, however, issue a final administrative decision affirming this finding until June 25, 1999, over three years later. On April 2, 1998, Pearce Konold requested an administrative hearing to contest the indicated find-

ing against him. On September 14, 1998, more than five months later, DCFS sent Konold a notice informing him that a hearing had been scheduled for November 19, 1998. The hearing was then postponed until March 4, 1999, almost one full year after he had initially requested such a hearing. The K.'s requested an administrative hearing on September 27, 1996 and received notice on September 9, 1997 (postmarked September 3, 1997) that a hearing was scheduled for September 15, 1997.

The court is fully cognizant of DCFS' limited resources. *See Stull v. Department of Children & Family Servs.*, 239 Ill.App.3d 325, 336, 179 Ill.Dec. 954, 606 N.E.2d 786, 793 (1992) ("We are not unsympathetic to the enormous problems faced by DCFS in terms of limited and shrinking resources and increasing, perhaps overwhelming, workload."). The indicated perpetrator, however, should not pay this price. Each day of delay marks another day during which a perpetrator, branded with the scarlet "I," is unable to secure any employment in the child care profession. Moreover, as the court has already pointed out, to the extent a review proceeding is necessary in order to determine the truth about an incident of harm to a child, or to permit a child to return to a stable environment, the child also pays a high price for DCFS' inability to proceed promptly.

Two Illinois appellate courts have already decided that "gross deviations" from DCFS' promulgated time frames violate a plaintiff's due process. *See Cavarretta*, 277 Ill.App.3d at 26–27, 660 N.E.2d at 256–57; *Stull*, 239 Ill.App.3d at 334, 179 Ill. Dec. 954, 606 N.E.2d at 792 (holding that plaintiff was deprived of procedural due process where his hearing to expunge an indicated report was not held until 347 days after his request and a final determi-

nation was not made for an additional 87 days). Defendant notes, however, that Amended Rule 336 has created a more structured and realistic timetable. Now, as soon as DCFS receives notice of an appeal, the Chief ALJ must set (1) a hearing date no more than 70 days after receipt of the appellant's request for such a hearing, and (2) a pre-hearing conference no less than 15 days before the scheduled hearing date. *See* ILL. ADMIN. CODE tit. 89, § 336.110(a)(1). Moreover, "the Director of the Department shall receive the Administrative Law Judge's recommended decision 90 days after receipt of a timely and sufficient request for an appeal … [and,] within the same 90 day period, … shall accept, reject, amend or return to the Administrative Hearings Unit for further proceedings the Administrative Law Judge's recommendation." *See* ILL. ADMIN. CODE tit. 89, § 336.220. Therefore, if followed, Amended Rule 336 will ensure that an individual is afforded a hearing, under a "preponderance of the evidence" standard, within 90 days of his or her request for appeal. Again, the court notes that, in theory, this is a marked improvement, but without evidence that any such improvement has yet occurred, the court must grant Plaintiffs' request for a preliminary injunction.

### iii. Disclosure and Use Policies

The Disclosure and Use Policies challenged by Plaintiffs are what truly give rise to the violation of Plaintiffs' protected interests. As has been stated over and over again, indicated perpetrators only suffer an effective bar to future employment once the indicated finding against them has been disclosed to and used by licensing agencies and present and future employers. The problem is that an indicated finding that is disclosed to and used by these identities is predicated on what the court has already determined to be a

practically nominal "credible evidence" standard. If DCFS were to increase the standard of proof necessary to include someone in the SCR, the court expects it would find the disclosure and use more palatable.

### iv. Special Policies

With regard to the five special policies listed earlier, Plaintiffs challenge three on procedural due process grounds. First, Plaintiffs argue that protective plans, which arguably implicate a liberty interest in one's familial relations, are violative of procedural due process because they are often implemented before DCFS even decides whether to "indicate" or "unfound" a report. Second, Plaintiffs claim that foster care placement "holds" violate their procedural due process rights because DCFS will prevent the placement of new foster children in homes based on an indicated finding, even if it the relevant foster parent is deemed "not responsible" for the abuse or neglect. Third, Plaintiffs argue that, in numerous cases, DCFS neglects to expunge indicated reports from the SCR where such reports have expired or were ordered expunged.

■ The court unhesitatingly directs DCFS to expunge any indicated reports from the SCR that either have expired or were ordered expunged, but finds that neither the protective plans nor the foster care placement "holds" violate Plaintiffs' procedural due process.[24] With regard to the protective plans, the court points to the example of L.D., the home day care owner and operator. In L.D.'s case, a DCFS investigator, before deciding whether there was sufficient evidence to indicate a report against L.D. or her son, A.D., obtained a written statement from L.D.

wherein she agreed that her son would not be in the home when children were present. While the court recognizes that L.D. may have only agreed to the protective plan so that her occupational license would not get revoked, her decision to prohibit her own son from entering her home during certain periods of the day was entirely voluntary. If she did not agree to such a plan, the court assumes, the appropriate licensing body would have initiated proceedings to revoke her license, and, as the court has already discussed, Plaintiffs do not challenge the license-revocation procedures. *See supra* note 19. Foster care placement "holds" are not voluntary, but the court nevertheless considers them to be a permissible response to suspected abuse or neglect, especially given the fact that, upon issuance of this order, the Indicated Report Decision–Making and Disclosure and Use Policies will be appropriately revised.

### 2. Substantive Due Process

■ In addition to offering individuals procedural rights, the Due Process Clause of the Fourteenth Amendment "includes a substantive component that provides a heightened protection against government interference with certain fundamental rights and liberty interests." *Brokaw*, 235 F.3d at 1018. Plaintiffs claim that the following four "special" policies violate substantive due process: (1) the protective plans; (2) foster care placement "holds"; (3) the maintenance of indicated reports against individual child care employees notwithstanding DCFS' determination that the employees are not responsible for abuse or neglect; and (4) the maintenance of indicated reports in the absence of any

---

24. The court does, however, recommend that DCFS institute a mechanism through which a child care employee who enters into a protec-

tive plan can later, presumably under changed circumstances, seek review of such a plan.

determination that they acted intentionally, recklessly, or negligently.

The court finds that none of these policies or procedures implicates a substantive due process right. In *Washington v. Glucksberg*, 521 U.S. 702, 719–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), the Supreme Court stated that the substantive component of the due process clause "provides heightened protection against governmental interference with certain fundamental rights and liberty interests," including things like the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to choose an abortion. *See id., cited in Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 964–965 (7th Cir.1998). Even more recently, the Seventh Circuit reaffirmed the fundamental right to familial integrity. *See Brokaw*, 235 F.3d at 1018 (citing *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Familial integrity, however, or any other fundamental right for that matter, is not impinged when either: (1) a foster care parent is not allowed to receive an additional foster child into his or her home; (2) an individual child care employee is indicated without a determination by DCFS that the particular individual was responsible for abuse or neglect; or (3) an indicated report is maintained in the SCR without a determination that an individual acted intentionally, recklessly, or negligently. The only one of the four policies cited by Plaintiffs that might possibly implicate a fundamental right to familial integrity is the imposition of protective plans whereby, for example, a teenage son, such as A.D., must leave his mother's home day care during the period of the day when children are present. As the court has already discussed in the previous section, *see supra* Discussion, Section A(1)(b)(iv), though, it does not consider a child care employee's voluntary agreement to such a plan to be constitutionally impermissible. Accordingly, the court does not find these special policies to violate Plaintiffs' substantive due process rights.

## C. Irreparable Harm/Balancing of Harm/Public Interest

The remaining factors of the preliminary injunction analysis have already been covered within the court's due process discussion. To repeat, the court recognizes, and does not wish to minimize, the public's interest in the protection of children from abuse and neglect. This interest, however, does not outweigh the irreparable harm (1) to those individuals who, while included as a perpetrator in the SCR, are unable to find any work in their chosen occupation, *see Stull*, 239 Ill.App.3d at 335, 179 Ill.Dec. 954, 606 N.E.2d at 793 ("The consequences of being listed on the State central register as a child abuser are grave . . . ."), as well as (2) the children of Illinois who find their relatively stable environments upset and, worse, may be exposed to an actual perpetrator overlooked during the investigative process. The court hopes that the 60 day deadline it imposes herein will prompt a relatively speedy resolution to these issues.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted. The parties have sixty (60) days to develop constitutionally adequate procedures. If the parties cannot agree on such procedures, the court will entertain a request that a mediator be appointed to assist them in this process.